UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF CALIFORNIA **FILED**

**OFFICE OF THE CLERK**
**501 "I" Street**
**Sacramento, CA 95814**

2008 MAR 20  A 10: 51

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

USDC
Northern District of CA
280 S. First St,. Room 2112
San Jose, CA 95113

**RE:      KENNETH RAY HARRIS vs. BEN CURRY**
**USDC No.:    2:08–CV–00314–MCE–JFM**

Dear Clerk,

Pursuant to the order transferring the above captioned case to your court, dated
March 14, 2008 , transmitted herewith are the following documents.

**Electronic Documents: 1 to 6.**

Documents maintained electronically by the district court are accessible through
PACER for the Eastern District of California at **https://ecf.caed.uscourts.gov**.

Please <u>acknowledge</u> receipt on the extra copy of this letter and return to the Clerk's Office.

Very truly yours,

**March 14, 2008**          /s/  A. Benson

Deputy Clerk
Tiffany Salinas-Harwell

RECEIVED BY: _____

Please Print Name

DATE RECEIVED:    MAR 2 0 2008

NEW CASE
NUMBER:          **C08  01530  PJH**

CLOSED, HABEAS

**U.S. District Court**
**Eastern District of California - Live System (Sacramento)**
**CIVIL DOCKET FOR CASE #: 2:08-cv-00314-MCE-JFM**
**Internal Use Only**

(HC)Harris v. Curry et al                          Date Filed: 02/11/2008
Assigned to: Judge Morrison C. England, Jr         Date Terminated: 03/14/2008
Referred to: Magistrate Judge John F. Moulds       Jury Demand: None
Cause: 28:2241 Petition for Writ of Habeas Corpus   Nature of Suit: 530 Habeas Corpus (General)
                                                   Jurisdiction: Federal Question

**Petitioner**

**Kenneth Ray Harris**                    represented by  **Kenneth Ray Harris**
                                                          D-62491
                                                          CORRECTIONAL TRAINING FACILITY (689)
                                                          P.O. BOX 689
                                                          SOLEDAD, CA 93960-0689
                                                          PRO SE

V.

**Respondent**

**Ben Curry**
*Warden*

**Respondent**

**Attorney General CA**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2008 | 1 | PETITION for WRIT of HABEAS CORPUS by Kenneth Ray Harris.(Duong, D) (Entered: 02/12/2008) |
| 02/11/2008 | | RECEIPT number #CAE200004750 $5.00 by Kenneth Harris on 2/11/2008. (Duong, D) (Entered: 02/12/2008) |
| 02/11/2008 | 2 | APPLICATION to Proceed IFP by Kenneth Ray Harris. (Duong, D) (Entered: 02/12/2008) |
| 02/12/2008 | 3 | [DISREGARD - See docket #4]PRISONER NEW CASE DOCUMENTS ISSUED; (Duong, D) Modified on 2/13/2008 (Plummer, M). (Entered: 02/12/2008) |
| 02/12/2008 | 4 | PRISONER NEW CASE DOCUMENTS ISSUED; (Attachments: # 1 Consent Forms) (Duong, D) (Entered: 02/12/2008) |
| 02/12/2008 | | SERVICE BY MAIL: 4 Prisoner New Case Documents for MCE served on Kenneth Ray Harris. (Duong, D) (Entered: 02/12/2008) |
| 02/25/2008 | 5 | CONSENT to JURISDICTION by US MAGISTRATE JUDGE by Kenneth Ray Harris. (Engbretson, K.) (Entered: 02/26/2008) |
| 03/14/2008 | 6 | ORDER signed by Magistrate Judge John F. Moulds on 03/14/08 ORDERING that this matter is TRANSFERRED to the Northern District of California and that the 2 IFP Application has not been ruled on. Original file, certified copy of transfer order, and docket sheet sent. CASE CLOSED. (Benson, A) (Entered: 03/14/2008) |
| 03/14/2008 | | SERVICE BY MAIL: 6 Order served on Kenneth Ray Harris. (Benson, A) (Entered: 03/14/2008) |

| 03/14/2008 | 🔵7 | TRANSMITTAL of DOCUMENTS per 6 Order on *3/14/2008* to * USDC* *Northern District of CA* *280 S. First St,. Room 2112* *San Jose, CA 95113*. *Electronic Documents: 1 to 6. *. (Benson, A) (Entered: 03/14/2008) |

1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10    KENNETH RAY HARRIS,

11            Petitioner,                    No. CIV S-08-0314 MCE JFM P

12        vs.

13    BEN CURRY, Warden, et al.,

14            Respondents.                   ORDER

15    _____/

16            Petitioner, a state prisoner proceeding pro se, has filed an application for a writ of

17    habeas corpus pursuant to 28 U.S.C. § 2254, together with a request to proceed in forma

18    pauperis. This court will not rule on petitioner's request to proceed in forma pauperis.

19            Petitioner challenges the November 2, 2006 decision of the California Board of

20    Prison Terms to deny him parole. Consequently, the instant petition is one for review of the

21    execution of a sentence imposed by a California state court. See Rosas v. Nielsen, 428 F.3d

22    1229, 1232 (9th Cir. 2005) (denial of parole is "a decision 'regarding the execution' of" a prison

23    sentence.) As a general rule, "[t]he proper forum to challenge the execution of a sentence is the

24    district where the prisoner is confined." Dunne v. Henman, 875 F.2d 244, 249 (9th Cir. 1989).

25    Petitioner is incarcerated at California Training Facility in Soledad, California, County of

26    Monterey, which lies in the Northern District of California. See 28 U.S.C. § 84(a).

1

1          Pursuant to 28 U.S.C § 2241(d), courts in both the district of conviction and the

2   district of confinement have concurrent jurisdiction over applications for habeas corpus filed by

3   state prisoners. While petitioner was convicted in this district, for the reasons set forth supra, the

4   proper forum for the instant challenge is in the district of confinement. In the interest of justice,

5   this court may transfer this action "to any other district where it might have been brought." 28

6   U.S.C. § 1404(a). Therefore, in the interest of justice, this action will be transferred to the

7   United States District Court for the Northern District of California.

8          In accordance with the above, IT IS HEREBY ORDERED that:

9          1. This court has not ruled on petitioner's request to proceed in forma pauperis;

10         2. This matter is transferred to the United States District Court for the Northern

11  District of California. 28 U.S.C. § 2241(d); 28 U.S.C. § 1406(a).

12  DATED: March 14, 2008.

13

14                                          UNITED STATES MAGISTRATE JUDGE

15

16  12

17  harr0314.108p

18

19

20

21

22

23

24

25

26

                                            2

AO 241 (Rev. 5/85)

### PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

# United States District Court

**District**   **EASTERN**

**FILED**

| Name | Prisoner No. | Case No. |
|---|---|---|
| **Kenneth Ray Harris** | **D-62491** | FEB 1 1 2008 |

Place of Confinement

**Correctional Training Facility, Soledad, California**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| **Kenneth Ray Harris**    V. | **Ben Curry (Warden)** |

The Attorney General of the State of:    **California**

**2:08 - CV - 3 1 4   MCE JFM HC**

## PETITION

1. Name and location of court which entered the judgment of conviction under attack ~~Superior Court in and~~ the county of Sacramento, California.

2. Date of judgment of conviction **July 2, 1987**

3. Length of sentence **15 years to Life**

4. Nature of offense involved (all counts) **Second Degree Murder**

5. What was your plea? (Check one)
   (a) Not guilty ☐
   (b) Guilty ☒
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   **N/A**

6. If you pleaded not guilty, what kind of trial did you have? (Check one)   **N/A**
   (a) Jury ☐
   (b) Judge only ☐

7. Did you testify at the trial?   **N/A**
   Yes ☐   No ☐

8. Did you appeal from the judgment of conviction?   **N/A**
   Yes ☐   No ☐

9. If you did appeal, answer the following:

   (a) Name of court      **N/A**

   (b) Result

   (c) Date of result and citation, if known

   (d) Grounds raised

   (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

      (1) Name of court

      (2) Result

      (3) Date of result and citation, if known

      (4) Grounds raised

   (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

      (1) Name of court

      (2) Result

      (3) Date of result and citation, if known

      (4) Grounds raised

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

   (a) (1) Name of court   **Superior Court of California, County of Sacramento**

      (2) Nature of proceeding   **Petition for writ of habeas corpus**

      (3) Grounds raised   **The Board of Parole Hearings (hereafter Board) violated the plea agreement by it's refusal to set a parole date within the Matrix**

for the Bast Term established for second degree murder.

Using the commitment offense to deny parole is a violation of Due Process

Violation of negotiated plea constitutes violation of Penal Code §1192.5

(4) Did you receive an evidentiary hearing on your petition, application or motion? (See attached)
Yes ⎯ No ☒

(5) Result   **Petition for writ of habeas corpus DENIED**

(6) Date of result   **July 11, 2007**

(b) As to any second petition, application or motion give the same information:

(1) Name of court   **Court of Appeal of the State of California, Third District**

(2) Nature of proceeding   **Petition for writ of habeas corpus**

(3) Grounds raised   **same as above**

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ⎯ No ☒

(5) Result   **Petition for writ of habeas corpus DENIED**

(6) Date of result   **August 23, 2007**

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.   Yes ☒   No ☐
(2) Second petition,   Yes ☒   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

**N/A**

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.
(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(I) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one: **THE BOARD VIOLATED THE PLEA AGREEMENT BY NOT SETTING A PAROLE DATE**

**WITHIN THE PRESCRIBED MATRIX FOR BASE TERM FOR SECOND DEGREE MURDER.**

Supporting FACTS (state *briefly* without citing cases or law) On  November  2,  2006,  the  Board  of

Parole  Hearings  (hereafter  Board)  denied  Petitioner  a  parole  date  based

on  the  commitment  offense.  (see  Exhibit  "A",  page  57-58)  CCR,  Title  15,

Division  2,  Article  11,  §2403  (c)  establishes  the  Matrix  for  Base  Terms

for  Second  Degree  Murder,  with  a  minimum  of  15  years  and  a  maximum  of  21

years.  On  a  plea  agreement,  without  assessing  any  more  time,  Petitioner's

should  not  be  incarcerated  more  than  the  suggested  term  set  by  statute.

B. Ground two: **USING THE COMMITMENT OFFENSE TO DENY PAROLE SUITABILITY IS A VIOLA-**

**TION OF PETITIONER'S DUE PROCESS RIGHTS AND THE PLEA AGREEMENT.**

Supporting FACTS (state *briefly* without citing cases or law): The  Board  recharacterized  Petitioner's

commitment  offense  by  using  the  term  "Laying  in  Wait"  which  is  a  First

degree  murder  element,  carrying  a  more  severe  penalty  that  what  Petitioner

agreed  to.  (See  Exhibit  "A",  page  58,  line  7)  (Also  see  California  Penal

Code  §1192.5)  Petitioner  was  sentenced  to  15  years  to  Life,  and  shouldn't

be  made  to  serve  more  time  than  the  21  years  maximum  suggested  base  term

for  Second  Degree  Murder.

C. Ground three: **VIOLATION OF FEDERALLY PROTECTED LIBERTY INTEREST AND DUE PROCESS OF LAW WITHOUT SUPPORTING EVIDENCE.**

Supporting FACTS (state *briefly* without citing cases or law):   On November 2, 2006 the Board denied Petitioner parole suitability well past his maximum Eligible Parole Date (See Exhibit "B", #11) without any supporting evidence that Petitioner's release would now pose a current risk of danger to society per California Penal Code §3041 (b).

D. Ground four: **THE BOARD DENIED PETITIONER DUE PROCESS OF LAW BECAUSE THE REASONS THEY DENIED PAROLE SUITABILITY ARE "IMMUTABLE."**

Supporting FACTS (state *briefly* without citing cases or law):   On November 2, 2006, the Board denied Petitioner parole suitability using the crime after more than 20 years of incarceration. (See Exhibit "A" pages 58 through 64) Petitioner contend, that a 20 year old crime is not a predictor of his present and future danger ousness after his many years of rehabilitation. (See Exhibit "C").

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ⸺   No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing

(b) At arraignment and plea

(c) At trial _____

_____

(d) At sentencing _____

_____

(e) On appeal _____

_____

(f) In any post-conviction proceeding _____

_____

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) Give date and length of the above sentence: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☒

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

**1-28-08**
(date)

_____
Signature of Petitioner

(7)

# E X H I B I T S

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )      CDC Number D-62491
Hearing of:                )
                           )
KENNETH HARRIS             )
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 2, 2006

11:31 a.m.

PANEL PRESENT:

Jack Garner, Presiding Commissioner
Jeff Sellwood, Deputy Commissioner
Janet Eng, Commissioner

OTHERS PRESENT:

Kenneth Harris, Inmate
Marian Tardiff, Attorney for Inmate
Frank Meyer, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Antonette Koons**
**Northern California Court Reporters**

ii

## INDEX

                                                              Page

Proceedings ........................................ 1

Case Factors ...................................... 9

Pre-Commitment Factors ........................... 11

Post-Commitment Factors .......................... 26

Parole Plans ..................................... 17

Closing Statements ............................... 46

Recess ........................................... 56

Decision ......................................... 57

Adjournment ...................................... 64

Transcriber Certification ........................ 65

--oOo--

1

**P R O C E E D I N G S**

1    COMMISSIONER ENG:  We are on the books,

2    and now I believe that we are adequately on the

3    record.

4    

5    **PRESIDING COMMISSIONER GARNER**: We start

6    it, one more time?  Or are we -

7    **COMMISSIONER ENG**:  No, we're ready.

8    **PRESIDING COMMISSIONER GARNER**:  Okay,

9    thank you.  All right.  This is a subsequent

10   parole consideration hearing for Kenneth Harris,

11   H-A R-R-I-S, CDC number D62491.  The date today

12   is November 2nd, 2006.  It's 11:31 a.m., and

13   we're located at the Correctional Training

14   Facility in Soledad.  Mr. Harris was received

15   into CDC on July 30, 1987, from Sacramento

16   County.  The offense was murder in the second

17   degree, and the case number is 79658.  Count

18   number one is PC187, the term was 15 years to

19   life, and the minimum eligible parole date was

20   September 8,2004.  This hearing is going to be

21   tape-recorded.  For purposes of voice

22   identification, each of us at the table's going

23   to be required to give our first name, last name,

24   spelling the last name.  Mr. Harris, when it

25   comes to your turn, if you'd also give us your

26   CDC number please.  I'll start, go to my left.

27   I'm Jack Garner, G-A-R-N-E-R. Commissioner.

2

1        **COMMISSIONER ENG:**  Janet Eng, E-N-G,

2   Commissioner.

3        **DEPUTY COMMISSIONER SELLWOOD:**  Jeff

4   Sellwood, S-E-L-L-W-O-O-D, Deputy Commissioner.

5        **DEPUTY DISTRICT ATTORNEY MEYER:**  Frank

6   Meyer, M-E-Y-E-R, (inaudible) County District

7   Office.

8        **ATTORNEY TARDIFF:**  Marian Tardiff, T-A-R-

9   D-I-F-F-, attorney for Mr. Harris.

10       **INMATE HARRIS:**  Ken Harris, H-A-R-R-I-S.

11       **PRESIDING COMMISSIONER GARNER:**  Your CDC

12   number, please.

13       **INMATE HARRIS:**  E62491.

14       **PRESIDING COMMISSIONER GARNET:**  Very good,

15   thank you.  And for the record, we do have two

16   correctional peace officers with us in the room

17   for purposes of security.  All right, Mr. Harris

18   and Ms. Tardiff, I have the form that the board

19   uses to provide reasonable accommodation.  This

20   is associated with the Americans With

21   Disabilities Act.  Mr. Harris signed the form on

22   May 11, 2006, checking the box that he needs to,

23   following to help him see and he needs his

24   glasses, and he has his own.  And I see that he's

25   - that you're wearing them today.  There is no

26   indication on the box of assistance that you

27   would require for the hearing, so let me note it.

3

1    Let me ask you today, has there been any change

2    since May in your mobility or your hearing?

3         INMATE HARRIS:  No, sir.

4         PRESIDING COMMISSIONER GARNET:  All right.

5    Grade point level of 9.9 was noted, and also for

6    the record the correctional counselor's review of

7    the central file didn't reveal any disabilities.

8    Let me ask a couple more questions, Mr. Harris.

9    Did you do an (inaudible) file review?

10        INMATE HARRIS:  Yes, sir.

11        PRESIDING COMMISSIONER GARNET:  And you

12   had your glasses with you that day?  You could

13   see the documents well enough?

14        INMATE HARRIS: Yes, sir.

15        PRESIDING COMMISSIONER GARNET:  All right.

16   Are you on any prescription medications?

17        INMATE HARRIS:  Yes, but it's not psych

18   drugs.

19        PRESIDING COMMISSIONER GARNET:  All right.

20   The only reason I'm asking is if there are side

21   effects that we need to know about, and if you're

22   current on taking your medications.

23        INMATE HARRIS: I'm current on taking my

24   medications and there are no side effects.

25        PRESIDING COMMISSIONER GARNET:  All right.

26   So there's nothing that would impact this

27   hearing?  That's my question.

4

1           **INMATE HARRIS:**  No, sir.

2           **PRESIDING COMMISSIONER GARNET:**  Okay.  Ms.

3    Tardiff, do you think we have sufficiently

4    addressed the ADA issues?

5           **ATTORNEY TARDIFF:**  Yes.  I would like to

6    make a correction.  I believe you said his

7    minimum eligible parole date was '04, when it's

8    actually 10/08/96.

9           **PRESIDING COMMISSIONER GARNET:**  Well,

10   we'll check the record, because the document that

11   I have here says 9/8/04, but we have another one

12   that confirms your date.  So we'll correct the

13   one that's in error.

14          **ATTORNEY TARDIFF:**  Thank you.

15          **PRESIDING COMMISSIONER GARNET:**  So we have

16   10/8/96.  Okay, very good.  Thank you, we got

17   that all corrected now.  All right.  This hearing

18   is being conducted pursuant to Penal Code

19   sections 3041 and 3042 in the rules and

20   regulations of the Board of Parole Hearings,

21   governing parole consideration hearings for life

22   inmates.  The focus of today's hearing is to

23   consider your suitability for parole.  In doing

24   so, we'll consider the number and nature of the

25   crimes you were committed for, your prior

26   criminal and social history and your behavior and

27   programming since your commitment.  We have had

5

1   the opportunity to review your central file and

2   your prior hearing transcript.  You'll be given

3   the opportunity to correct or clarify the record.

4   We'll consider your progress since your

5   commitment and since your last hearing.  Your

6   updated counselor's report and psychological

7   report will also be considered, and any change in

8   parole plans should be brought to our attention.

9   We will reach a decision today, and inform you

10  whether or not we find you suitable for parole

11  and the reasons for our decision.  If you are

12  found suitable for parole, the length of your

13  confinement will be explained to you.  This

14  hearing will be conducted in a number of phases.

15  I'll discuss with you the crime you were

16  committed for, your prior criminal and social

17  history.  Commissioner Eng will discuss your

18  parole plans and any letters of support or

19  opposition that may be in the file.  Commissioner

20  Sellwood will discuss with you your progress

21  since your commitment, your counselor's report

22  and your psychological evaluation.  Excuse me.

23  Once that's concluded, Commissioners, the

24  District Attorney and your attorney will be given

25  the opportunity to ask you questions.  Questions

26  from the District Attorney will be asked through

27  the chair, and you should address your answers

6

1    back to the panel.  Before we recess for

2    deliberations, the District Attorney, your

3    attorney and you will be given an opportunity to

4    make a final statement regarding your parole

5    suitability.  Your statement should be directed

6    to why you feel you're suitable for parole.  We

7    will then recess, clear the room and deliberate.

8    Once we've completed our deliberations we will

9    resume the hearing and announce our decision.

10   The California Code of Regulations states

11   regardless of time served, the life inmate shall

12   be found unsuitable for and denied parole if in

13   the judgment of the panel the inmate would pose

14   an unreasonable risk of danger to society if

15   released from prison.  Now, Mr. Harris, you had

16   certain rights coming into today's hearing.  The

17   first was a timely notice to the hearing.  Second

18   being the right to review your central file, and

19   third being the right to present relevant

20   documents.  I ask you and Ms. Tardiff if those

21   rights have been met.

22        **ATTORNEY TARDIFF:**  They have, best of my

23   knowledge.

24        **PRESIDING COMMISSIONER GARNET:**  Okay.

25   Thank you.  You also have the right to be heard

26   by an impartial panel. Today your panel will

27   consist of myself, Commissioner Eng and

7

1   Commissioner Sellwood.   Any objection to the

2   panel?

3       **INMATE HARRIS:**   No, sir.

4       **PRESIDING COMMISSIONER GARNET:**   Thank you.

5   You will receive a copy of our written tentative

6   decision today and a copy of the tentative

7   decision and a copy of the transcript will be

8   sent to you in the future.   You might recall from

9   a previous panel they discussed with you a change

10  in the appeal procedures, and if you will to

11  appeal a panel decision now, you're required to

12  go through the courts where you live at.

13      **INMATE HARRIS:**   Yes, sir.

14      **PRESIDING COMMISSIONER GARNET:**   Okay.   And

15  you're not required to admit your offense, or

16  discuss your offense if you do not wish to do so.

17  However, this panel does accept as truth the

18  findings of the court, and you're invited to

19  discuss the facts and circumstances of the

20  offense, if you desire.   The board will review

21  and consider any prior statements you've made

22  regarding the offense and determining your

23  suitability for parole.   At this time I'll ask

24  Commissioner Sellwood if there's confidential

25  material in your central file, and if we will be

26  using it at today's hearing.

27      **DEPUTY COMMISSIONER SELLWOOD:**   There is

8

1    confidential information.  I do not believe it's

2    relative to this hearing.

3         **PRESIDING COMMISSIONER GARNET:**  Okay,

4    thank you.  Ms. Tartiff, hearing check list

5    making its way around?

6         **ATTORNEY TARDIFF:**  Yes.  I have those

7    documents, thank you.

8         **PRESIDING COMMISSIONER GARNET:**  Do you

9    have all the documents, Mr. Meyer?  Okay, thank

10   you.  And Ms. Tardiff, do we have any additional

11   documents to submit?

12        **ATTORNEY TARDIFF:**  I have submitted them.

13        **PRESIDING COMMISSIONER GARNET:**  Oh, very

14   good.  Any preliminary objections?

15        **ATTORNEY TARDIFF:**  No.

16        **PRESIDING COMMISSIONER GARNET:**  And will

17   Mr. Harris be speaking with the panel today?

18        **ATTORNEY TARDIFF:**  Except for the

19   commemoratives.

20        **PRESIDING COMMISSIONER GARNET:**  All right.

21   Very good.  All right, Mr. Harris, in that you

22   will be speaking to the panel on other matters,

23   if I could get you to raise your right hand,

24   please.  Do you solemnly swear or affirm that the

25   testimony you give at this hearing will be the

26   truth, the whole truth, and nothing but the

27   truth?

9

1        **INMATE HARRIS:**  Yes, sir.

2        **PRESIDING COMMISSIONER GARNET:**  Thank you.

3    All right.  What I'm going to do is read into the

4    record, a summary of the commitment offense, and

5    the first summary that I find is in the report

6    that was prepared for the Board for the February

7    2004 calendar.  And this report was prepared by

8    Correctional Counselor Taporco, T-A-----.  And

9    Counselor Taporco is a correctional counselor

10   one.

11             "On October 6, 1986 at

12             approximately 0830 hours, while

13             Heidi, H-E-I-D-I, Homuth, H-O-M-U-

14             T-H, was at work, Kenneth Harris

15             removed the window screen and

16             entered through the bedroom window

17             into Heidi's apartment.  Harris

18             waiting until 1730 hours when Heidi

19             Homuth returned to her home from

20             work.  After several hours of

21             arguing, Harris wrapped his two

22             hands around Heidi's neck and

23             started choking the victim until

24             she laid on the floor, becoming

25             unconscious.  When the victim

26             started regaining consciousness,

27             Harris took a cord, looped it

10

1          around the victim's neck, and

2          strangled her from behind until she

3          again became unconscious.  When the

4          victim started regaining

5          consciousness for the second time,

6          Harris sat on the victim's chest,

7          placed a heavy amount of pressure

8          on a large candlestick holder over

9          her throat, until she died."

10         The version that was in the same report

11    from Mr. Harris is that he was wandering around

12    for a few days after the commitment offense, then

13    decided to go to his sister's house.  His sister

14    talked him into going to his brother's, who drove

15    him to the Campbell Police Department to turn

16    himself in.  Okay, so far as the prior record,

17    I'll note that as a juvenile there was no record

18    noted in the file.  Okay, and I'm going to be

19    going between a couple of different documents.

20    I'm noting a court action based on a Selinus PD

21    arrest.  The arrest was on August 31st of 1980,

22    and the court action was on September 3rd of

23    1980, and this was for a 148PC, obstructing or

24    resisting a public officer.  And the sentence in

25    this was four days in jail, and also there was

26    credit for time served.  The next I'm noting is a

27    San Jose PD, a vehicle code 20002, misdemeanor

11

1    hit-and-run.  And I'm noting that this was a

2    conviction, and he was convicted as a

3    misdemeanor, since it was misdemeanor hit-and-

4    run.  And there is no notation as to the specific

5    sentence.  I'm also noting that there was a

6    August of '86 arrest by the highway patrol, and

7    this was after being stopped for speeding and

8    driving under the influence.  There was initially

9    a false identification, and there was some

10   resistance to the officers in the fight

11   continuing until a stun gun was used.  And the

12   disposition on this is that a warrant was issued,

13   and that as a result of the Harvey waiver, with

14   respect to the commitment offense, this charge

15   didn't proceed.  I'm also noting that on

16   September 21st, 1986, there was a 273.5PC, some

17   HNS, and also a battery.  This was a Seaside

18   Police Department report, and this was another

19   situation about 2:30 in the a.m., when police

20   officers were dispatched to a residence in a

21   report of a fight.  And a witness told the

22   officers to, "Hurry up, come inside, call for

23   some backup.  He's beating her up, he's gonna

24   kill her.  And you to, unless you get some help."

25   The officers entered the residence and saw the

26   defendant sitting on a couch, and the victim

27   lying on the floor.  And this particular

12

1   situation, while talking to the defendant, you

2   raced up to an officer, took a combative stance,

3   and tried to strike the officer.  And the officer

4   spoke with the victim at the hospital, and the

5   indication , or the quote was that you began

6   "wailing on the victim".  And again, on this

7   particular situation of November of '86, the

8   warrant was issued and the charge was dismissed

9   as a result of the Harvey waiver and the guilty

10  plea to the commitment offense.  A little bit

11  about -- it's a very brief section, normally we

12  have a little bit more talking about your

13  personal life.  And it looks like you're correct

14  birth date September 9, 1961?

15          **INMATE HARRIS:**  Yes, sir.

16          **PRESIDING COMMISSIONER GARNET:**  All right.

17  Is it correct that you were born to the union of

18  James and Juanita, and you're the youngest of

19  four children?  That's correct also?  And it

20  describes you as spending the majority of your

21  life in a stable home in Marina, California.

22          **INMATE HARRIS:**  Yes, sir.

23          **PRESIDING COMMISSIONER GARNET:**  And, what

24  did your father do, sir.

25          **INMATE HARRIS:**  In the military.

26          **PRESIDING COMMISSIONER GARNET:**  In the

27  military.  So he was down at Fort Ord?

13

1          **INMATE HARRIS:**  Yes, sir.

2          **PRESIDING COMMISSIONER GARNET:**  All right.

3     And how about your mom?

4          **INMATE HARRIS:**  She worked on the post

5     also.

6          **PRESIDING COMMISSIONER GARNET:**  All right.

7     So were you on base housing?  Or did you live

8     off-base?

9          **INMATE HARRIS:**  In Marina.  Off-base.

10          **PRESIDING COMMISSIONER GARNET:**  In Marina,

11    off-base.  Okay.  And did you graduate from high

12    school?

13          **INMATE HARRIS:**  Yes, sir.

14          **PRESIDING COMMISSIONER GARNET:**  Which

15    high?

16          **INMATE HARRIS:**  Seaside.

17          **PRESIDING COMMISSIONER GARNET:**  Seaside?

18    Okay, and did you pursue any other education

19    after that?

20          **INMATE HARRIS:**  Yes, sir, I have a

21    (indiscernible) degree.

22          **PRESIDING COMMISSIONER GARNET:**  From

23    Hartnell?

24          **INMATE HARRIS:**  MPC.

25          **PRESIDING COMMISSIONER GARNET:**  Oh,

26    Monterey Peninsula.

27          **INMATE HARRIS:**  Yes, sir.

14

1          PRESIDING COMMISSIONER GARNET:  Okay.

2     This report says you've never been married.

3          INMATE HARRIS:  No.

4          PRESIDING COMMISSIONER GARNET:  Any

5     children?

6          INMATE HARRIS:  No, sir.

7          PRESIDING COMMISSIONER GARNET:  And at any

8     point in your childhood or as a young teen, did

9     drugs and alcohol become a consideration with

10    you?

11         INMATE HARRIS:  Yes, sir.

12         PRESIDING COMMISSIONER GARNET:  What age

13    for the drugs, approximately?

14         INMATE HARRIS:  High school.

15         PRESIDING COMMISSIONER GARNET:  And what

16    types of drugs?

17         INMATE HARRIS:  Marijuana, alcohol.

18         PRESIDING COMMISSIONER GARNET:  And either

19    of those continue as you advanced in age?

20         INMATE HARRIS:  No, sir.  Alcohol

21    continued.

22         PRESIDING COMMISSIONER GARNET:  All right.

23    Did you have any jobs while you were in high

24    school?

25         INMATE HARRIS:  Yes, sir.  I had jobs.

26         PRESIDING COMMISSIONER GARNET:  How about

27    after you got out of high school.

15

1          **INMATE HARRIS:**  Yeah, I was mostly in

2     college.   I was in construction, did construction

3     mostly, just the primary jobs.

4          **PRESIDING COMMISSIONER GARNET:**  Okay, at

5     the time you were arrested were you still living

6     at home, or did you have your own place?

7          **INMATE HARRIS:**  No, I had my own place.,

8          **PRESIDING COMMISSIONER GARNET:**  Where was

9     that?

10          **INMATE HARRIS:**  Sacramento California, at

11     the residence where this crime took place.

12          **PRESIDING COMMISSIONER GARNET:**  All right.

13     And what was involved in the relocation to

14     Sacramento?   The victim?

15          **INMATE HARRIS:**  Yes.

16          **PRESIDING COMMISSIONER GARNET:**  All right.

17          **INMATE HARRIS:**  She had a job offer up

18     there, and we moved up there.

19          **PRESIDING COMMISSIONER GARNET:**  Okay.

20     Ever hospitalized as a youngster for anything?

21          **INMATE HARRIS:**  No, sir.

22          **PRESIDING COMMISSIONER GARNET:**  No

23     injuries, no illness?  And you've described your

24     home as stable, and I want to put on the record

25     that you have indicated that there was no abuse

26     in the household.  Is that correct?

27          **INMATE HARRIS:**  Yes, sir.

16

1    **PRESIDING COMMISSIONER GARNET:**  And where

2    were you before you were in Marina?

3        **INMATE HARRIS:**  I grew up --

4        **PRESIDING COMMISSIONER GARNET:**  I'm only

5    asking because it's pretty unusual for a duty

6    post in the military to last that long.  Normally

7    your father would have been transferred around a

8    little bit.

9        **INMATE HARRIS:**  Well, we lived in Germany

10   for three years.

11       **PRESIDING COMMISSIONER GARNET:**  Okay.  So

12   there was some period of time, as a result of

13   your father's duty assignment, you lived outside

14   the area.

15       **INMATE HARRIS:**  In fact, that's where

16   (indiscernible) base was.

17       **PRESIDING COMMISSIONER GARNET:**  All right.

18   Okay.  Did you do sports in high school?

19       **INMATE HARRIS:**  Yes, sir.

20       **PRESIDING COMMISSIONER GARNET:**  What did

21   you do?

22       **INMATE HARRIS:**  Football.

23       **PRESIDING COMMISSIONER GARNET:**  Football?

24   Did you letter?

25       **INMATE HARRIS:**  Yes, sir.

26       **PRESIDING COMMISSIONER GARNET:**  Oh, good.

27   Okay, at this time I'm going to direct you over

17

1    to Commissioner Eng.  She's going to talk to you

2    about your parole plans, and any letters of

3    support or opposition that may be in the file.

4        **COMMISSIONER ENG:**  Hi, Mr. Harris.  I see

5    that you and your attorney handed in some recent

6    letters.  We have one from your father, who's

7    been there for you all this time.  Mr. James

8    Harris, who lives in Marina.  And he states that

9    -- it appears that he's been doing an awful lot

10   in, you know, providing additional support to you

11   once you get out.  He wants to be able to provide

12   you with housing.  It doesn't say anything about

13   financial support, but he is hoping that you'll

14   be able to continue your education and to be

15   employed, etcetera.  So that's from your father

16   James, and we received that on October of '06.

17   And I see that for -- in terms of -- you also

18   handed something else to me, for residence.  You

19   have three people listed.  Number one is your

20   father James Harris.  Number two is Irene Sorato,

21   S-O-R-A-T-O.  And the third one is Tami, T-A-M-I,

22   Beliunas, B-E-L-I-U-N-A-S.  And the latter two --

23   okay, so Irene Sorato is your second mother?

24       **INMATE HARRIS:**  Yes.  Basically, she was

25   my best friend's mother.

26       **COMMISSIONER ENG:**  Oh, your best friend's

27   mother.  Okay.  And is she offering residence to

18

1    you?

2           **INMATE HARRIS:** (indiscernible).

3           **COMMISSIONER ENG:** It's all right.  Is

4    there any letter from her?

5           **INMATE HARRIS:** There should be in the

6    record.  Did you get it?

7           **ATTORNEY TARDIFF:** No, those were the only

8    things I got.  I mean, did you look under the --

9    it might be in the C-file.  Did she send any

10   letter today?

11          **INMATE HARRIS:** I'm sure she had it.  She

12   has to have --

13          **ATTORNEY TARDIFF:** No, those were the only

14   ones I got.

15          **COMMISSIONER ENG:** Yeah.  So this is all I

16   have here, is just the one letter, copy of the

17   one from your father.  But that's all right.

18          **ATTORNEY TARDIFF:** That's all I got.

19          **COMMISSIONER ENG:** Is your father -- is he

20   living alone right now?

21          **INMATE HARRIS:** Yes, he is.

22          **COMMISSIONER ENG:** And he has been since -

23          **INMATE HARRIS:** Your niece lives with him?

24   All right.  How large is his house?

25          **INMATE HARRIS:** Ah, three bedrooms, two

26   bath.

27          **COMMISSIONER ENG:** So there is an extra

19

1   room for you, I'm assuming?  Okay.  So you were

2   just providing this as a backup, just in case

3   your -- from Irene Sorato, and then Tami

4   Beliunas?

5       **INMATE HARRIS:**  Well, those are actually

6   backups.

7       **COMMISSIONER ENG:**  Right.

8       **INMATE HARRIS:**  Those two are actually

9   backups.  My father is the primary.

10      **COMMISSIONER ENG:**  Right, okay.  And then

11  the employment was smart to do as a backup,

12  except that we do need to -- it would be good for

13  you to have those letters too.

14      **INMATE HARRIS:**  It was my understanding

15  that they were here.  I know it says -- it's too .

16  late now, but I was told that they were faxed Ms.

17  Tartiff.

18      **COMMISSIONER ENG:**  Right.

19      **INMATE HARRIS:**  And we're going to have

20  to-- .

21      **ATTORNEY TARDIFF:**  The only ones -- I

22  submitted the faxed letters I received.  I

23  checked as late as 10:00 last night, and had no

24  other faxes regarding Mr. Harris.

25      **COMMISSIONER ENG:**  All right.

26      **ATTORNEY TARDIFF:**  So --

27      **COMMISSIONER ENG:**  Okay.

20

1          INMATE HARRIS:  Can I say this please?

2     The -- I didn't provide phone numbers for the

3     Board, so that can still be verified.  The fact

4     I'm --

5          COMMISSIONER ENG:  Right.  But no matter

6     what, you know, when anything goes through

7     review, everything gets confirmed or verified.

8     But it's still your responsibility to make sure

9     that any people -- all of your support people do

10    in fact send documentation, send letters, and

11    have them be very very specific about what

12    they're offering.

13         INMATE HARRIS:  Yes, ma'am.

14         COMMISSIONER ENG:  Okay.  I have a letter

15    her from -- I don't know how to pronounce this --

16    is this Cepeda? C-E-P-E-D-A, Construction?

17         INMATE HARRIS:  Cepeda.

18         COMMISSIONER ENG:  Cepeda Construction.

19    Specifically signed by Stephen, S-T-E-P-H-E-N, J.

20    Cepeda, C-E-P-E-D-A.  And Mr. Cepeda states that

21    he has been a long-time friend of yours,

22    throughout junior high and all your high school

23    days to the present, and that he is really

24    offering you a full-time employment.  And all the

25    help he can possibly give you to engage in a

26    productive new beginning.  Can you elaborate on

27    that?  And what would you be dg for Cepeda

21

1    Construction?

2        **INMATE HARRIS:**  I would be doing

3    carpentry, general construction, whatever's

4    necessary, whatever's needed.  But I've been gone

5    a long time, it's going to be real hard for me to

6    pinpoint.  I don't know what most cars look like

7    out there now, so it would really be hard for me

8    to try to narrow things down to exactly what I'd

9    be doing for somebody who's been out there in a

10   well-established -- they've been out there a long

11   time, I've been in here this whole time.  So it's

12   hard for me to -- the only thing that I can say

13   with certainty is that the employment will be

14   there, and I will do whatever is required of me.

15       **COMMISSIONER ENG:**  Has Mr. Cepeda been

16   communicating with you or you communicating with

17   him over the years?

18       **INMATE HARRIS:**  Yes, we have.

19       **COMMISSIONER ENG:**  How often and by what

20   means?

21       **INMATE HARRIS:**  I talk to him on the phone

22   every couple of weeks.

23       **COMMISSIONER ENG:**  Has he been in to visit

24   you?

25       **INMATE HARRIS:**  No.

26       **COMMISSIONER ENG:**  Okay, he's never come

27   to visit.

22

1          **INMATE HARRIS:**  No, he hasn't.

2          **COMMISSIONER ENG:**  How about your father?

3          **INMATE HARRIS:**  Yes.

4          **COMMISSIONER ENG:**  How often does your

5     father --

6          **INMATE HARRIS:**  Every other Sunday.

7          **COMMISSIONER ENG:**  Okay.

8          **INMATE HARRIS:**  He was just here this past

9     Sunday a long time.

10         **COMMISSIONER ENG:**  I believe that this

11    other -- unfortunately it's not very clear, this

12    other document, but --

13         **ATTORNEY TARDIFF:**  No, that's how I got

14    it.

15         **COMMISSIONER ENG:**  -- sent to me, but it

16    is a -- looks like a schedule for Alcoholics

17    Anonymous, in Monterey, California.  And I

18    believe that this was provided -- I'm not sure,

19    is it provided from --

20         **ATTORNEY TARDIFF:**  His father.

21         **COMMISSIONER ENG:**  His father, which is a

22    very nice thing for him to do, to go out of his

23    way to figure out how to set up additional

24    community support for you.  Okay.  And then the

25    other things that were handed to me is this copy

26    of the first 30 days, for Ex-Offenders Bureau of

27    Prisons, that pretty much outlines different ways

23

1    and different things that a newly-paroled inmate

2    can use or go to for Social Security benefits,

3    and to get some funding, etcetera.  And then this

4    Community Resource Directory from the Department

5    of Corrections and Rehabilitation.  Have I left

6    anything out, that you know of, in terms of your

7    parole plans?

8         INMATE HARRIS:  No, ma'am.

9         COMMISSIONER ENG:  Is your father retired?

10        INMATE HARRIS:  Yes, ma'am.

11        COMMISSIONER ENG:  Okay.  Is he in a

12    financial position to at least help you out

13    financially, besides having a roof over your

14    head?

15        INMATE HARRIS:  Yes, ma'am.

16        COMMISSIONER ENG:  What about your niece.

17    What's the name of your niece.

18        INMATE HARRIS:  Andrea.

19        COMMISSIONER ENG:  How old is Andrea?

20        INMATE HARRIS:  Seventeen.

21        COMMISSIONER ENG:  Does she come and visit

22    you also?  Have you --

23        INMATE HARRIS:  Yeah, she's been here.

24    She's not a regular, she's a normal teenager --

25        COMMISSIONER ENG:  Right.

26        INMATE HARRIS:  --got better things to do

27    with her life than come see her uncle in prison.

24

1    Of course, you know, she wasn't born when I --

2    when I first came to prison she wasn't born yet.

3         COMMISSIONER ENG:  Right.

4         INMATE HARRIS:  She only knows me

5    (indiscernible).

6         COMMISSIONER ENG:  I think that pretty

7    much sums it up, then.  Unless the Commissioner

8    has any further questions about Mr. Harris's

9    parole plans?

10        PRESIDING COMMISSIONER GARNET:  I do not.

11        COMMISSIONER ENG:  All right.

12        DEPUTY DISTRICT ATTORNEY MEYER:  Not

13   speaking to the commitment offense itself, but to

14   your use of controlled substances at the time.

15   Were you using PCP?

16        INMATE HARRIS:  No, sir.

17        DEPUTY DISTRICT ATTORNEY MEYER:  Okay.  I

18   don't have any other questions.  Commissioner?

19        PRESIDING COMMISSIONER GARNET:  No, I do

20   not.

21        DEPUTY DISTRICT ATTORNEY MEYER:  At this

22   time, then I think what I'm going to ask you to

23   do, sir, is to direct your attention, Mr. Harris,

24   over to Commissioner Sellwood.  He's going to

25   talk to you about your institutional behavior and

26   also your psychological exam.

27        INMATE HARRIS:  Good morning.

25

1        DEPUTY COMMISSIONER SELLWOOD:  It's still

2   morning, we've got three minutes.  Okay, good

3   morning, sir.  I'm going to take information from

4   a variety of sources.  If I make a mistake, or if

5   I leave anything out, please let me know, sir, so

6   we can correct the record.  All right.  I'll

7   start with your current classification score of

8   19, and a custody level of Medium A.  Your last

9   hearing was on September 8th of '04.  That was

10  subsequent number four, and you received a two-

11  year denial.  You were received here on April

12  25th, 1995.  In relation to discipline, 128s,

13  you've had five 128s throughout your history

14  here, with the most recent one being August of

15  '05, for an out-of-bounds.  But before that not

16  sure about that one?  Okay, I was just noticing

17  the look on your face.

18       INMATE HARRIS:  Yeah, I was trying to

19  place it.

20       DEPUTY COMMISSIONER SELLWOOD:  August of

21  '05 for out-of-bounds, but before that all the

22  way back to  1991.  So a long period of time

23  between those 128s.   you've had six 115s, with

24  the most recent one being in September of '93,

25  for refusing a direct order.  So since '93,

26  there's only been one 128, and that gives you 13

27  years with just one 128, and that's very good for

26

1   you, sir.  You should be commended on that.

2           **INMATE HARRIS:**  Thank you, sir.

3           **DEPUTY COMMISSIONER SELLWOOD:**  I'm going

4   to review the period just a little bit before

5   your last hearing and up to the present, from the

6   Board report.  We start with the period from

7   April of '04 through March of '05.  States that

8   in terms of vocation, there were no vocational

9   activity during that period.  You were pursuing

10  academic improvement through Coastline Community

11  College, and I want to -- well, I'll just go

12  ahead and ask that now.  I looked at your

13  academic history.  Utah State, four, five junior

14  colleges, don't know if you ever got into San

15  Jose State or not.  You didn't play ball there I

16  know.

17          **INMATE HARRIS:**  I got in, but I had to

18  drop immediately because it was a double transfer

19  from --

20          **DEPUTY COMMISSIONER SELLWOOD:**  Okay, yeah.

21  And unfortunately, yeah you had a football

22  scholarship to Utah State.  Did you register that

23  freshman year?

24          **INMATE HARRIS:**  I played.

25          **DEPUTY COMMISSIONER SELLWOOD:**  You did

26  play the freshman year?  Okay.  DB corner?

27          **INMATE HARRIS:**  That's right.

27

1          **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  But

2     then you were going to transfer and play at San

3     Jose State, but you didn't play at San Jose

4     State.  Did you play in JC at all?

5          **INMATE HARRIS:**  I played -- after Utah

6     State I ended up playing at MPC --

7          **DEPUTY COMMISSIONER SELLWOOD:**  You did.

8          **INMATE HARRIS:**  - because San Jose state

9     and Utah State were on the same league, and that

10    made me a double transfer, so --

11         **DEPUTY COMMISSIONER SELLWOOD:**  Oh, yeah.

12    Right.

13         **INMATE HARRIS:**  So I had to drop --

14         **DEPUTY COMMISSIONER SELLWOOD:**  So you had

15    to drop at least a whole year in between and --

16         **INMATE HARRIS:**  Get my AA in order to

17    become eligible.

18         **DEPUTY COMMISSIONER SELLWOOD:**  Right.  And

19    then, so you did get your AA?

20         **INMATE HARRIS:**  Yes, sir.

21         **DEPUTY COMMISSIONER SELLWOOD:**  But you

22    didn't go back to San Jose and play there?

23         **INMATE HARRIS:**  I ended up in trouble.

24         **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  So

25    you're still pursuing Coastline Community College

26    while here, but of course an AA is as far as a

27    Community College can go, so you're picking up

28

1  units of interest as opposed to pursuing another

2  degree?

3       **INMATE HARRIS:**  Yes, sir.

4       **DEPUTY COMMISSIONER SELLWOOD:**  Okay.   What

5  kind of interest?

6       **INMATE HARRIS:**  Well, I can't afford to go

7  to a University.

8       **DEPUTY COMMISSIONER SELLWOOD:**  Okay.   What

9  kind of interests?   What are you pursuing at

10  Coastal?

11       **INMATE HARRIS:**  Sociology.

12       **DEPUTY COMMISSIONER SELLWOOD:**  All right.

13       **INMATE HARRIS:**  So I can do counseling.

14       **DEPUTY COMMISSIONER SELLWOOD:**  Again,

15  going back to this period, '04 to '05, all right?

16  In terms of work, you were assigned as a unit --

17  it says proter -- but it means porter, a unit

18  porter, until 11 of '04.  Group activities, you

19  participated in Alcoholics Anonymous, and in

20  terms of prison behavior, you programmed

21  favorably this period.  On 11 of '04, which is

22  why you didn't continue on I assume, you went

23  into AD SEG for concerns that you were a

24  participant in a wing (indiscernible), later to

25  be discovered that you were not a participant,

26  and you were really not a part of that problem.

27  So you got out of AD SEG, and that was dismissed.

29

1   Okay.  From 3/05 to 6/06, no vocational,

2   continued the Coastline Community College, you

3   worked as an education porter from 3/05 through

4   3/06.  You continued Alcoholics Anonymous, and

5   you received, on 12/28/05, a 128B, explaining

6   that you had been suspended from your assignment

7   for inappropriate remarks to a supervisor.

8   However, you did not receive a 128A disciplinary

9   or 115 regarding that.  It was basically just

10  kind of a note -- counseling note.  Someone

11  didn't appreciate what was said.

12        INMATE HARRIS:  Actually, what was said

13  was -- there was a discussion taking place on the

14  state of the prisons in the State of California

15  right now.  And the comment, just so you know,

16  was that are riots taking place in Southern

17  California in the prisons in Southern California.

18  And my comment was that it was just a matter of

19  time before it reached the prisons in Northern

20  California.  So that's what the comment was.

21        DEPUTY COMMISSIONER SELLWOOD:  So it

22  wasn't of a sexual nature, or anything like that?

23        INMATE HARRIS:  No, no.

24        DEPUTY COMMISSIONER SELLWOOD:  Okay, thank

25  you.  I looked at some chronos, and noted that --

26  picked up a couple of chronos that you also

27  provided, so I'll just go from the ones that you

1   provided.  This chrono here that you attended AA

2   first quarter of '06 is in your C file, so I have

3   that one noted.  And here's another one that

4   talks about you being an active member in good

5   standing with the Balanced Reentry Activity

6   Group.  The public relations team, in support of

7   CTF's Extended Parole Preparedness Program.

8   That's from July of '06.  That is not in your C

9   file.

10          **INMATE HARRIS:**  Okay.

11          **DEPUTY COMMISSIONER SELLWOOD:**  So I'm

12  going to give these back to you, so you make sure

13  they get put in.  Here's from one of 10/06,

14  10/24, so just a week ago, of '06.  You were, as

15  his assigned supervisor, so this says this is

16  your assigned supervisor.  He has observed your

17  behavior and activities and your daily movements.

18  You have proven to be an individual who gets

19  along well with custody and staff and inmates

20  alike.  Your demeanor is such that your remorse

21  is obvious concerning the crime, and that you are

22  constantly seeking ways to improve yourself.

23  It's a very positive chrono.  And then here is a

24  letter of commendation, signed by a Hugh

25  McMillan, coordinating teacher for Buddhist

26  Meditation Studies at CTF.  Basically what it

27  says is that your attendance and participation in

31

1    the Buddhist Meditation Studies does not entitle
2    you to a laudatory chrono, so instead of a
3    laudatory chrono, he's putting on the record that
4    you've been participating actively and positively
5    in the Buddhist Meditation Studies.  Okay.  And
6    that is not in your file either, so I would --
7    I'm going to give these back to you, and -- here
8    you are, Counsel.  Make sure you get those in.
9    And in this one there is a chrono.  This one is
10   on the Alternative to Violence program, dated
11   July of '06, and it just states that you have
12   been an active participant in and you completed
13   the Alternatives to Violence program, offered
14   here at CTF.  That chrono is, in fact, in your
15   file, also.  So I'll still give that back to you.
16          **ATTORNEY TARDIFF:**  There actually was
17   several phases of this program, correct?
18          **DEPUTY DISTRICT ATTORNEY MEYER:**  Oh, are
19   you saying that's an update from the chrono,
20   maybe?
21          **ATTORNEY TARDIFF:**  No, I don't think that
22   this was in the packet.
23          **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  The
24   one that's in the packet is 9/06.  "You are to be
25   commended for your voluntary participation and
26   contribution to promoting a peaceful, non-violent
27   programming environment within the Alternatives

32

1    to Violence project.  That's from September of

2    '06.  That's the chrono that's in there.

3         ATTORNEY TARDIFF:  Yeah, they said that

4    he's got the July.

5         DEPUTY COMMISSIONER SELLWOOD:  Yeah, are

6    you looking at other ones I may not have

7    mentioned?

8         ATTORNEY TARDIFF:  Well, there's a --

9         INMATE HARRIS:  There's just three

10   different dates?

11        DEPUTY COMMISSIONER SELLWOOD:  For the

12   Alternatives to Violence program?

13        INMATE HARRIS:  Yes, sir.  One from July,

14   September, and June.

15        DEPUTY COMMISSIONER SELLWOOD:  So it's

16   obviously an ongoing program?  Is that correct,

17   sir?

18        ATTORNEY TARDIFF:  There's three phases.

19        DEPUTY COMMISSIONER SELLWOOD:  And so

20   you've been involved with each of those phases,

21   getting credit for each of those phases.

22        ATTORNEY TARDIFF:  You should have it in

23   your packet.

24        DEPUTY COMMISSIONER SELLWOOD:  Now that

25   you've said that, Counsel, I guess I'd better

26   find it.

27        ATTORNEY TARDIFF:  No, you should have it

33

1    in your -- one that you -- your own.

2         **DEPUTY COMMISSIONER SELLWOOD:**  I have a

3    July Alternatives to Violence.

4         **ATTORNEY TARDIFF:**  Right, and then

5    September.

6         **DEPUTY COMMISSIONER SELLWOOD:**  And the

7    September one was the one I -- okay.  A question

8    that Commissioner Eng asked you, and I wanted to

9    ask you, have you pursued vocational training

10   here in the institution?

11        **INMATE HARRIS:**  In your facility?

12        **DEPUTY COMMISSIONER SELLWOOD:**  Yes.

13        **INMATE HARRIS:**  Yes, sir.

14        **DEPUTY COMMISSIONER SELLWOOD:**  And what

15   has that been?

16        **INMATE HARRIS:**  Vocational appliance

17   repair.

18        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Was

19   there silk-screening also, did I see that

20   somewhere?

21        **INMATE HARRIS:**  Vocational silk screening,

22   that was at Solano State Prison.

23        **DEPUTY COMMISSIONER SELLWOOD:**  That was

24   quite a while, like '95 or something.  That was

25   quite a while ago for the silk screening.  Okay,

26   so silk screening, and you actually have a

27   certificate of achievement on the silk-screening,

34

1   if I remember correctly.  And you also got a

2   certificate on the appliance repair.

3        **INMATE HARRIS:**  Yes, sir.

4        **DEPUTY COMMISSIONER SELLWOOD:**  So that's

5   quite a few hours.  Have you updated that, or

6   worked with the appliance repair at all recently?

7        **INMATE HARRIS:**  Well, no.  They don't have

8   it here.

9        **DEPUTY COMMISSIONER SELLWOOD:**  They don't

10  have it here?  Okay.  I don't know if appliances

11  change that much or not, but that might be an

12  avenue for you upon release, to look for a job

13  there.  Okay.  What I'm going to do now is go

14  through and review the most recent psych report,

15  and I'm going to hold in obeisance for just a

16  moment, what appeared to be a problem for a

17  previous Board.  And I'll explain that in a

18  moment.  I'm going to go over the generalities of

19  the report first, and then go in depth into a

20  prior problem.  In terms of educational history,

21  it does mention here that you got your high

22  school diploma, and that you have completed an AA

23  degree.  Okay, yeah, it talks about the appliance

24  repair was '98, okay.  Under psychosexual

25  development and sexual orientation.  "We question

26  about unusual or sexually aggressive behavior.

27  The inmate adamantly denies ever engaging in

35

1    sexually-aggressive behavior.  The central file

2    contained a CINI report, in which it indicates

3    that the inmate was charged for a sex offense.

4    However, it indicates that he was acquitted of

5    these charges and related charges were dismissed.

6    As a result of this acquittal and dismissal of

7    other charges, this is a non-issue for this

8    clinician.  I believe -- Commissioner, did you

9    already mention the Harvey --

10    **PRESIDING COMMISSIONER GARNET:**  We have on

11    the record the two Harvey issues associated with

12    the CHP traffic stop, and also the episode in

13    Seaside of the fight, occurring on September 21st

14    of '86.

15    **DEPUTY COMMISSIONER SELLWOOD:**  Thank you.

16    In terms of substance abuse history, in response

17    to a question earlier you indicated high school

18    as an age for substance abuse.  This indicates

19    that you began drinking at age eight, with

20    intoxication such that your parents actually

21    noticed it.  Eight's an awfully young age, but

22    your parents were noticing that you were drinking

23    enough to be intoxicated at a very young age.  It

24    states then that you began abusing marijuana at

25    15, and you indicate that you started using PCP

26    at age 22, but about ten times.  So it wasn't

27    long-time usage.  "The inmate indicates that he

36

1   also abused Benzedrine on a couple of occasions."

2   But -- thought it might enhance your football

3   performance, but you played poorly, and so you

4   got away from Benzedrine.  Coach probably made

5   that happen.

6       **INMATE HARRIS:**  Yes.

7       **DEPUTY COMMISSIONER SELLWOOD:**  "What are

8   you doin' out there?"  After the commitment

9   offense, Harris began attending AA and NA in the

10   Department of Corrections.  I know that we have a

11   chrono saying that you've been doing that

12   recently.  Has your attendance been over a long

13   period of time?

14      **INMATE HARRIS:**  Since '89, I believe.

15      **DEPUTY COMMISSIONER SELLWOOD:**  And has it

16   been consistent and sustained over that period of

17   time?

18      **INMATE HARRIS:**  Yes.

19      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  In

20   addition to AA and NA, he has attended Breaking

21   Barriers and Life Skills, and he has been drug

22   and alcohol-free for at least 15 years.  The

23   inmate's violence potential, as compared to level

24   two inmate population is below average.  If

25   released to the community, his violence potential

26   would be considered to be no more than the

27   average citizen in the community.  Due to his

37

1    substance abuse and alcohol abuse in the distant

2    past, it is very unlikely that he would return to

3    alcohol or drug abuse.  However, should that

4    occur in the community would be a significant

5    risk as a precursor to violence for this

6    individual.  Which would speak to -- have you

7    secured a sponsor for AA or NA in the community?

8         **INMATE HARRIS:**  No, sir.  Actually, one of

9    the things that they do on the Monterey Peninsula

10   is just like with the community resources, they

11   want you out.

12        **DEPUTY COMMISSIONER SELLWOOD:**  They want

13   you out before they'll --

14        **INMATE HARRIS:**  I've called them, they'll

15   talk to you, but they're not going to assign

16   anybody to you.

17        **DEPUTY COMMISSIONER SELLWOOD:**  I

18   understand there are some of those barriers.  All

19   right.  Now, what I'm going to do is -- a prior

20   Board -- I believe the most recent prior Board --

21   expressed some concern over your psychiatric

22   report, which I've just been reading from, which

23   was July of '04.  And I didn't mention that it

24   was written by S. Sexton, PhD, consulting

25   psychologist.  And that concern appeared to

26   revolve around a 2002 diagnosis of ADHD.  So this

27   Board attempted to look at all the available

38

1    behavior, (indiscernible), "-all the available

2    material to resolve -- to see if we still have

3    the same concern regarding the '04 psych, or how

4    we saw it."  So, basically, what we found was

5    that we are not concerned with the '04 psych

6    report in relation to the ADHD, because of these

7    reasons.  Let me go back and review, first of

8    all, the first appearance of this ADHD, and from

9    whenst comes all of the problems here.  We're

10   talking about a November 1, 2002 report.  That

11   report being written by J. Steward, Doctor of

12   Psychology, Clinical Psychologist at CT

13   (indiscernible).  And the essence of this is that

14   he raises for the first time the specter of ADHD.

15   Let me simply note that in the '01 psych, there

16   is no mention of ADHD, nor in any prior psych.

17   So the specter of this gets raised for the first

18   time in '02, and it's raised with this statement.

19   Under Substance Abuse History, on the third

20   paragraph, "Based upon this extended interview

21   with Inmate Harris, it appears he was attempting

22   to self --"  dah dah, wrong place.  I think

23   there's a better statement.  Hang on.  Give me

24   just a moment, I want to make sure that I

25   accurately and --

26        **ATTORNEY TARDIFF**:  I think that's what you

27   want to read.

1           **DEPUTY COMMISSIONER SELLWOOD**:  Let me just

2     make sure.  All right, all right.  Very good.  I

3     tried to find the very first place that ADHD came

4     up in the report, and hopefully an explanation of

5     what was going on, because there are later

6     references to ADHD.  So this is the first place

7     it comes up, and again it is under Substance

8     Abuse History.  "Based upon this extended

9     interview with Inmate Harris, it appears he was

10    attempting to self-medicate with illegal drugs

11    for attention deficit disorder/attention deficit

12    hyperactivity disorder.  In Inmate Harris's case,

13    he coped with this disorder through criminal

14    behavior. Then it refers to ADHD a number of

15    other times, saying that you needed to be

16    medicated for that diagnosis, and that that

17    medication was important to future stability.

18    But that's really all there is about why the

19    doctor made that diagnosis.  In fact, there

20    really is no place where it says, "And my

21    diagnosis is-", because there's no access, one,

22    two, three, four, five, description.  So now, so

23    we've established here that, in this statement,

24    the doctor says, "You, sir, have ADHD."  Now

25    we're going to go to the next report, which is

26    the report dated January 30th of 2003.  This

27    report is signed by J. Steward, Clinical

40

1    Psychologist, Correctional Facility Soledad.

2    There went my paper.

3         **ATTORNEY TARDIFF:**   It starts on page two.

4         **DEPUTY COMMISSIONER SELLWOOD:**   I

5    understand, Counsel, I was looking for something

6    else.   All right.   Go on side two of the tape.

7    All right.   We're on side two of the tape.   What

8    I was noticing, was that J. Steward prepared the

9    '02 report, and J. Steward prepared the '03

10   report.   I had not earlier made notice of that.

11   I had thought, by not making notice of it, I had

12   thought one doctor was looking at another

13   doctor's work and contradicting.   But in fact,

14   these are the same doctor, and he simply, later

15   on, correcting it.   And what he does to do that,

16   is he says, under Current Mental Status and

17   Treatment Needs, in this '03 report, "Regarding

18   the ADD/ADHD diagnosis.   Based upon the second

19   interview, 1/30/03, diagnostic markers used to

20   conclude this inmate may have ADD/ADHD are

21   attributable to other reasons/causes.

22   Consequently, the ADD/ADHD diagnosis, and the

23   recommendations for medication are no applicable

24   to Inmate Harris.   So the same doctor who for the

25   first time in '02 said ADD/ADHD, came back the

26   next review and said, "Not true."   To solidify

27   that in the world of psychological reports, we

41

1   then come to our report of July 9th of 2004.  And
2   there, on the section under Current Mental Health
3   Status Treatment Needs, the access one diagnosis
4   is, "No contributory clinical disorder, access to
5   no contributory personality disorder."  Access
6   five, GAF score of 85.  And this is S. Sexton,
7   PhD.  And says, specifically addressing this
8   issue, "Although much was made of a personality
9   disorder in previous psychiatric reports for the
10   Board of Prison terms, nothing in the inmate's
11   presentation, throughout our two-hour contact,
12   suggested a personality disorder.  Nor does his
13   performance in the Department of Corrections over
14   the last 11 years.  As a result, his access two
15   diagnosis is none."  So just a review, in '02
16   Doctor Steward says ADHD, in '03 Doctor Steward
17   says, "Oops, not true, other factors.  Not a
18   legitimate diagnosis."  And in '04, the next
19   doctor, Doctor Saxton says, "Nope, not accurate,
20   no such diagnosis is correct."  Therefore, for
21   me, and I do believe for the rest of the panel,
22   they can tell me if it's not true.  But I do
23   believe that we have determined that for this
24   particular component, the psychological reports
25   seem to address it well, and clearly, and
26   relieved for me any concern of ADHD as diagnosis.
27   That completes my part, Commissioner.

42

1          **PRESIDING COMMISSIONER GARNET:**  Okay, very

2     good.  I don't have any additional questions.

3     Any follow-up questions from either of you,

4     Commissioners?

5          **COMMISSIONER ENG:**  I do.  Just a couple.

6     During the years before you became incarcerated,

7     would you -- could you think of one word to

8     describe your whole attitude back then?

9          **INMATE HARRIS:**  Expectant.

10         **COMMISSIONER ENG:**  Expecting?

11         **INMATE HARRIS:**  Expectant.

12         **COMMISSIONER ENG:**  Expectant.  And why?

13         **INMATE HARRIS:**  'Cause back then my whole

14    focus in life was on playing professional

15    football.  And everything that I did was directed

16    towards that goal.  And truthfully, I was pulled

17    off of that goal numerous times by drugs and

18    alcohol, and I lost my focus.  And I got involved

19    in some things I shouldn't have been involved in

20    and (indiscernible).  I don't think that I can

21    sit here and really give you a word to describe

22    either myself or my situation.  But looking back

23    right now, expecting is the only thing I can

24    really come up with.  I was really expecting to

25    do good things with my life, and it just didn't

26    happen.  I hope I -- can you ask me something --

27         **COMMISSIONER ENG:**  Sure.  Well, I'm trying

43

1    to extract certain -- to get a better feel of you

2    and where you were back then, and how you look

3    back at the choices that you made.  What --

4    because you say that, you know it's the drugs and

5    alcohol that sort of led you away from being

6    focused on your goal.

7        **INMATE HARRIS:**  They didn't lead me way,

8    they took me away.  I mean, one year I -- one

9    year I had a tryout with a football team.  And

10   when that tryout day came around, I was

11   incarcerated for drunk driving.  So,  I mean it

12   was my fault, it was totally my own fault, but I

13   wasn't making the connection between the

14   lifestyle I was living and the lifestyle I was

15   trying to achieve.  I wasn't able to make that

16   connection.

17       **COMMISSIONER ENG:**  Okay.  Yeah.

18       **INMATE HARRIS:**  Drinking -- getting drunk

19   was normal.  That's what we did.  After every

20   game, every practice, I mean, that's what we did.

21   And I never really -- I didn't know I was an

22   alcoholic until I was in prison.  I truly didn't

23   know it.  I didn't know that I had a drug problem

24   until I was in prison.  And it was in hindsight,

25   so I can say a whole bunch of things to you, but

26   none of them are going to justify, you know, my

27   behavior.  They're not going to justify my

44

1    actions nor my attitude, because I don't really

2    have the vocabulary to explain that to you.

3        COMMISSIONER ENG:  I think you did a

4    pretty adequate job there.  Would you say that

5    you were an angry young man.

6        INMATE HARRIS:  Yes, ma'am.  I was kind of

7    angry.

8        COMMISSIONER ENG:  And what was causing

9    that anger, do you think?

10       INMATE HARRIS:  I think what caused the

11   anger is that most of the guys who I grew up

12   with, most of the people I that I grew up with

13   had to work extra hard for the things they had,

14   but once they got it they kept it on track.  I

15   basically handed it.  I was handed a lot of

16   things.  I don't -- I didn't have the excuses

17   that most people have for failing, but I failed

18   anyhow.  And my anger as a result of that -- I

19   couldn't accept the fact that I failed myself.

20   And so those around me were suffering as a

21   result, but I wasn't able to recognize it back

22   then.  Did I answer your question at all?

23       COMMISSIONER ENG:  Yes, you did.  And I do

24   have more questions, but I can't get them

25   organized well enough right now.  I just -- do

26   you have any other --

27       PRESIDING COMMISSIONER GARNET:  Well, I --

45

1    part of me wants to know that you recognize the

2    situation that you were in many years ago, and

3    what led up to where you are today, and -- given

4    the situation, the stresses in life, how do you

5    think and how are you prepared to deal with

6    disappointment today?

7         **INMATE HARRIS:**  Well, ma'am, the last 20

8    years of my life have been dealing with this

9    point.  This environment right here, if it

10   doesn't do anything else, it prepares you on how

11   to deal with stress and disappointment in

12   different ways.  No -- I mean, this is

13   (indiscernible) world, but it's so compact, that

14   you can't get away with anything in here.

15   Regardless of how minute it might be.  You have

16   to -- you're being made to answer for all of your

17   actions.  And I think over time and maturity,

18   with maturity I've been able to see that it's not

19   -- the world's not going to end tomorrow if I

20   don't get what I see today.  And so I'm just able

21   -- I'm able to deal with the stresses that come

22   along with life now.  My understanding of what

23   life is about is -- it's a thousand times better

24   than what it was when I was a teenager.

25        **COMMISSIONER ENG:**  Well put.  I don't have

26   any further questions.

27        **PRESIDING COMMISSIONER GARNET:**  Mr. Meyer,

46

1   questions?

2          **DEPUTY DISTRICT ATTORNEY MEYER:**  No, thank

3   you.

4          **PRESIDING COMMISSIONER GARNET:**  Ms.

5   Tardiff, any questions you would like to ask Mr.

6   Harris?

7          **ATTORNEY TARDIFF:**  No.

8          **PRESIDING COMMISSIONER GARNET:**  All right.

9   Mr. Meyer, could I get you to close please?

10         **DEPUTY DISTRICT ATTORNEY MEYER:**

11  Considering the crime, it would be hard to

12  imagine a more horrible type of crime -- the

13  offense that was carried out in an especially

14  heinous and callous manner, that showed really no

15  regard at all for human life.  He strangled this

16  young woman.  She had been in, apparently, a

17  loving relationship with him.  But suffered at

18  his hands serious physical abuse.  The evidence

19  is -- shows that as recently as a just a couple

20  of weeks before the actual murder took place he

21  had beat her seriously enough to send her to the

22  hospital.  She wanted to end the relationship,

23  walk away from this man, and he wasn't going to

24  allow this to happen.  The evidence that was

25  brought out and it showed that he went to her

26  residence, he broke in and waited for her to

27  return.  And then he killed her, and he killed

47

1    her brutally.  And strangled her once with his

2    hands.  When she didn't die from that, he

3    strangled her again with a cord.  And when she

4    still didn't die, he sat on her chest and used a

5    candle-holder against -- forced against her neck.

6    He finally killed her.  The suffering that that

7    woman had experienced is hardly imaginable.  And

8    then he takes her car and flees.  I would submit

9    that the motive in this crime is pretty clear

10   that his concerns and desires were all that

11   mattered to him.  And this young woman was not

12   going to walk out on him -- if he couldn't have

13   her, no one could have her.  And so, it's -- when

14   you've been doing this a long time, it's just

15   hard to see a more brutal crime than this one.

16   And his prior criminal record, it contains not

17   big violence, but there's violence sprinkled all

18   through it.  Resisting arrest -- I realize a

19   misdemeanor offense, but resisting law

20   enforcement and then the 1980 incident.  We've

21   got another resisting incident in 1982.  He has a

22   hit-and-run offense in 1984.  Between 1981 and

23   1985, he had several driving under the influence

24   and driving under suspended license offenses.

25   And then, at the time of the homicide, he had two

26   pending cases that were dismissed, with hardly-

27   wavered consideration.  Both of these involved

48

1    violence, another assault case, and then another

2    fighting with police.  So you can see, I think,

3    from this record, that at least at this part of

4    his life -- I mean -- you had a real problem with

5    authority.  And you were very quick to take the

6    police on and confront them.  As far as his

7    institutional behavior, Mr. Harris appears to see

8    his transition well into an institutional

9    setting.  He's programmed favorably.  He

10   certainly is to be commended, in fact, as long as

11   he's been in prison he's had six pretty minor 115

12   incidents.  He's had nothing since 1993.  He's

13   had no violence -- no reported violence in these

14   two things.  And like I said, he is to be

15   commended.  His parole plans appear positive.   .

16   His father has certainly demonstrated the love

17   that a parent can have for his child no matter

18   what.  And he is there for him.  Appears he's got

19   an employment opportunity waiting for him, so

20   through family and friends that -- it does appear

21   that he's got a support network out there that

22   will be there for him when the time does come for

23   him to be released, and that's good.  The

24   psychiatric report -- it appears to be positive.

25   The most recent one we've got from 2004 reports

26   that -- it was referred to here.  The concern

27   that I see the report, the last report, the panel

49

1    had considered that the report seems to downplay

2    Mr. Harris's well-documented tendency for

3    violence and his inability to control himself

4    through his violent conduct when he was out of

5    custody.  And now, like I say, he's certainly

6    performed well in a controlled environment that

7    the Department of Corrections provides.  How he's

8    going to do on the outside is the question.  He's

9    got a long history of drug and alcohol abuse and

10   the psych report does note that a return to drugs

11   and alcohol would greatly increase the risk of

12   danger to the community would represent.  There

13   was some question -- in his earlier time, he was

14   an angry young man.  I think he gave a very

15   insightful answer about himself and his

16   expectations.  (indiscernible).  Unfortunately

17   his choice of a response was violence.  And

18   whether it was the drugs and the alcohol, the

19   choices Mr. Harris made were bad choices.  I was

20   particularly -- my attention was drawn to the

21   comment, or the answer that he gave in response

22   to the Board member's question about his attitude

23   at the time.  He said he was expecting, that his

24   while focus had been to play professional

25   football.  It certainly sounds like, from what we

26   know , that he certainly had the talent and the

27   skill, that might have been a real possibility

1    for him.  It's really kind of amazing that
2    someone who's that focused on wanting to do that
3    -- that they go out and get drunk and get
4    arrested and put in jail, this life- acquitter's
5    supposed to have a trial.  I guess I'll conclude
6    by saying that Mr. Harris presents a real Jekyll
7    and Hyde person.  And if he's released, which one
8    -- which kind of Harris is going to come out?
9    He's done well in an institutional setting, and
10   I'm going to say -- deserves commendment  for
11   what he's achieved.  But if he faces adversity
12   and returns to drugs and alcohol and violence, I
13   just can't escape the conclusion that at this
14   time he's not suitable for parole.  I will close
15   . that in society he would be a threat to the
16   public if he were to be released at this time.
17        **PRESIDING COMMISSIONER GARNET:**  All right.
18   Thank you.  Ms. Tardiff?
19        **ATTORNEY TARDIFF:**  Thanks.  A few things
20   Mr. Harris would like to have addressed.  The --
21   I'll put that on the record now before I go into
22   my closing.  That he accepts full responsibility
23   for the offense, and have no factors to change on
24   the record.  And a lot of that -- not discussing
25   the commitment offense -- it says particularly --
26   "Since every time I've discussed it in the past
27   my suitability turned into a retrial."  That he

51

1    objects to the District Attorney's standing that
2    Mr. Harris is not suitable for parole.
3    Specifically it states that, "The District
4    Attorney's objections to my release on parole is
5    insufficient in itself, due primarily to two
6    factors.  One, that the District Attorney's
7    office extended a plea bargain for which I
8    accepted and completed my end of the bargain.
9    There is no reason that the District Attorney
10   should be opposing my parole after 20 years of
11   incarceration, and honoring quietly my
12   commitment.  And two, the District Attorney's
13   input is only relative at the time of sentencing,
14   to affect the aggravated term.  Also caveat on
15   that is that is, "In previous parole hearings,
16   the Board failed to consider the term I would
17   serve is calculated by the matrix on the time I
18   have actually served as factors in the
19   suitability equation."  In terms of Mr. Harris's
20   pre-incarceration history, much of it is
21   supportive of release.  He has a high school
22   diploma and an AA degree, he came from an intact,
23   stable family.  He was involved in sports.  He
24   had no juvenile criminal history, and I would
25   submit he had an insignificant criminal
26   conviction.  Most of that  was around drugs and
27   alcohol.  In terms of the commitment offense

52

1    itself, I believe a mitigating factor is that he

2    turned himself into the police, and that his

3    prior criminal history was non-violent in nature

4    in terms of actual convictions.  Since he's been

5    incarcerated we have, of course, the vocational

6    upgrading, education upgrading, continuous

7    participation in self-help, most recently the

8    Alternatives to Violence.  And he's been

9    attending AA for over 17 years.  He also does the

10   meditation on his own.  He received laudatory

11   chronos from his supervisors, indicating that

12   he's a well-respected and good inmate.  In terms

13   of the District Attorney's remarks, basically he

14   stated that the crime itself, in and of itself,

15   wasn't a reason to continue to deny parole.  I

16   think that the issue is not the crime itself but

17   whether or not Mr. Harris poses an unreasonable

18   risk of danger.  I think based on his lack of

19   violent 115s, the last 115 he had was in 1993, so

20   it's been a significant amount of time -- and

21   none of those six 115s involved force or

22   violence.  So basically we have a patterns of

23   over 20 years of no force or violence being

24   committed by Mr. Harris since he's been

25   incarcerated.  The remark was made the District

26   Attorney that he had a problem with authority.

27   He may have had a problem with authority, but he

53

1   certainly does not appear to have one today,

2   which is reflected in his 115s and the lengthy

3   period of over 13 years since his last 115.   He

4   does have a history of drug and alcohol abuse,

5   and that is -- will always be a factor of

6   concern.   Anybody who's had a prior history of

7   drugs and alcohol, you never know if someone is

8   going to stay clean and sober.   There's no way of

9   testing that, other than releasing someone out

10  into society.   There's no guarantee anyone in

11  society or incarcerated, what they're going to

12  do.   You just have to go by what the evaluations

13  state.   And they show that - particularly the

14  most recent one states that drugs and alcohol do

15  not appear to be a problem at this time, as Mr.

16  Harris has remained clean and sober for over 17

17  yrs.   And that's really the only thing we can go

18  by, is the longevity of his being clean and

19  sober.   Again, getting back to the commitment

20  offense itself, we're not here to retry the case,

21  that's been done.   He was given a term to serve,

22  he served over 20 years, which I submit is

23  certainly long enough time for punishment.   Again

24  the issue is, "Does he pose an unreasonable risk

25  of danger?   He has excellent parole plans, he has

26  strong family support, he's going to live with

27  his father.   He has a job offer, he has

54

1    marketable skills, he's going to go to AA/NA

2    meetings.  He has a list of those meetings, where

3    to go to.  His psych evils are supportive of

4    release.  His most recent one, which has been --

5    gone into some things I would like to have placed

6    on the record.  There's no indications of

7    psychotic thinking, delusional beliefs or

8    instability of mood.  Again, no access one or

9    access two diagnosis.  When asked about the

10   commitment offense, it became clear that the

11   commitment offense was ego-dystonic, E-G-O, D-Y-

12   S-T-O-N-I-C.  That is, the offense was alien to

13   the kind of person that he is now, which makes it

14   somewhat difficult to understand and explain.

15   But it's clear than alcohol abuse and drug abuse

16   played a significant role in his commitment

17   offense.  Going into the assessment of

18   dangerousness, it's pointed out that he has not

19   been disciplined even one time for aggressive

20   behavior.  Combining this with his maturity and

21   increasing age, if this inmate were released, he

22   would pose no more of a risk than the average

23   citizen.  And then getting to the drug and

24   alcohol abuse, it states under item  of Section

25   14, "Due to the inmate's substance abuse and

26   alcohol abuse in the distant past, it is very

27   unlikely that"  And it concludes at the last

55

1    section of the report, "Though inmate Harris had

2    a drug and alcohol problem in the past, it does

3    not currently appear to be an issue. So I

4    believe that puts to rest somewhat that is no

5    longer a significant risk factor. And then the

6    '03 and the '02, we've gone into that, where was

7    this issue about his Access two diagnosis, that's

8    been gone over quite a bit. And I'd note that --

9    I made notes that his '90, '95, '98, and '01,

10   none of those had an access two diagnosis. So

11   that should take care of those issues. I don't

12   know what more Mr.

13   Harris can do if he were to be incarcerated.

14   He's done just about everything he needs to do,

15   in terms of all the areas of factors.. His self-

16   help, his education, vocational, all of that he's

17   pretty much done. At this point I think further

18   incarceration would be in and of itself just a

19   form of punishment, and I do believe that he's

20   been punished enough for his commitment offence.

21   And at this time I don't see -- well, I put it

22   this way =the factors of suitability far outweigh

23   the unfactors of suitability. And I'll submit it

24   on that. Thank you.

25            **PRESIDING COMMISSIONER GARNET:** All right.

26   Thank you. Okay. Mr. Harris, if you'd like to

27   address the panel, this is your opportunity to

56

1    speak to us about your suitability.

2         **INMATE HARRIS:**  I want to say that just

3    like my attorney spoke, I need to continue

4    consolation on my behalf, I'm just in punishment.

5    Five years from now, ten years from now, there's

6    nothing I'm gonna really be able to say or do

7    that's gonna change what happened.  I'm terribly

8    sorry.  I live daily of the memory of why I'm

9    here.  If I was through this tomorrow, that's not

10   going to change.  Ten years from now, it's not

11   going to change.  And despite what the new doctor

12   says, or the new counselor says or

13   (indiscernible) says or even what the panel

14   member says, I'm truly remorseful for why I'm

15   here.  Truly.  I don't have the words, I really

16   don't  And that's all I've really got.

17        **PRESIDING COMMISSIONER GARNET:**  All right,

18   thank you.  It is 12:46 p.m.  We will recess for

19   deliberations.

20

21                         R E C E S S

22                          --o0o--

23

24

25

26

27

57

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3       **DEPUTY COMMISSIONER SELLWOOD:**  We are on the

4    record.

5       **PRESIDING COMMISSIONER GARNET:**  All right.

6    Very good.  It is 1:38 p.m. in the matter of

7    Kenneth Harris, V62491.  Again that's 62491.  Mr.

8    Harris, the panel has reviewed all the

9    information received from the public and relied

10   on the following circumstances in concluding that

11   you're not yet suitable for parole and would pose

12   an unreasonable risk of danger to society or

13   threat to public safety if released from prison.

14   We are going to deny you for one year, with some

15   very specific requests for you to consider.  And

16   we think it will more adequately prepare you for

17   your next panel.  So I wouldn't worry about

18   taking any notes today.  You know you'll get a

19   transcript.  So take heart to the transcript,

20   because we did take a little extra time to try to

21   give you some areas that we think would be

22   helpful to give the panel additional confidence.

23   You know we start with the commitment offense,

24   and the panel noted that it was carried out in an

25   especially cruel and callous manner.  The victim

26   in this case, Heidi Homuth, 28 years of age, was

27   **KENNETH HARRIS  D-62491 DECISION PAGE 1 11/02/06**

58

1  first strangled by hand, then by cord, then

2  finally with a candlestick.  And after the victim

3  was strangled, you stole her motor vehicle.  The

4  panel noted that the offense was carried out in a

5  very dispassionate and calculated manner, and

6  that you gained entry illegally to the residence

7  that she was in.  You were lying in wait.  There

8  is evidence that some alcohol and narcotics were

9  consumed prior to her arriving.  And once she did

10  arrive, there was a dispute leading to her death.

11  The panel noted the offense was carried out in a

12  manner that demonstrated an exceptionally callous

13  disregard for human suffering, and that on a

14  couple of occasions the victim regained

15  consciousness, but she was previously recovering

16  from injuries that were previously inflicted by

17  you, and that the victim basically died a very

18  slow, tortured death.  The motive for this, the

19  best the panel can conclude, is that it was the

20  issue of rejection.  She had apparently wanted to

21  terminate the relationship and had actually moved

22  away.  First of all, her sister took her to

23  Southern California after the last assault, and

24  then ultimately she relocated away from the area

25  that she was previously living in.  Conclusions

26  were drawn from a statement of facts that have

27  **KENNETH HARRIS  D-62491 DECISION PAGE 2 11/02/06**

59

 1    been previously read into the record and will be

 2    adopted by reference and that was from the

 3    February 2004 Board report.  The Panel did note

 4    that so far as  your previous record, that you

 5    did have a record of violence and assault

 6    behavior, that you did have an escalating pattern

 7    of criminal conduct, and that you did have an

 8    especially unstable and tumultuous relationship,

 9    particularly with this victim.  So far as the

10    prior criminality, the panel did note that you

11    did have multiple PC148s.  These are the ones

12    that are either resisting or obstructing a peace

13    officer, and that you also did have the multiple

14    23152s, which are the driving under the influence

15    situations and also the 14601s, which is

16    operating a motor vehicle with a suspended or

17    revoked license.  There was also the misdemeanor

18    hit-and-run, which was noted and previously read

19    into the record.  So far as the institutional

20    behavior, the misconduct while incarcerated

21    includes five 128A counseling chronos, the last

22    being August 24,2005.  This was for being out of

23    bounds, and that there were six serious 115.

24    disciplinary reports, the last being September

25    24, 1993.  And this is for refusing a direct

26    order.  The panel noted the psychological report

27    **KENNETH HARRIS  D-62491 DECISION PAGE 3 11/02/06**

60

1    that was prepared in July 2004   by Direct.

2    Sexton.   The panel noted that even though it is

3    essentially a two-year-old report, it's

4    favorable, and it did clear the long-standing

5    issue that had previously been of concern to the

6    panel.   What we're going to do is we're going to

7    give you an initial psych before your next

8    hearing, and the reason for that is that at the

9    time, a panel may want to consider giving you a

10   date.   It's better for you to have two solid

11   psychs in a row.   So hopefully the next psych

12   will be as favorable as the one that was done by

13   Doctor Sexton in July of 2004.   We would

14   certainly encourage you to operate with the

15   clinician in getting that report completed.

16   Parole plans -- we did not that you do have

17   viable residential plans in the county of last

18   legal residence with your father, and that you do

19   have the job offer, and that even there they're

20   somewhat dated, you do have marketable skills.

21   What we are going to encourage you to do is to

22   take advantage of this period of time, because

23   apparently there was a letter that you thought

24   might have been faxed to Ms. Tardiff.   You'll

25   have the opportunity now, get a little extra time

26   on those, make sure all of your support letters

27   **KENNETH HARRIS  D-62491 DECISION PAGE 4 11/02/06**

61

1    that are very specific as to what kind of support

2    they're offering for you.  You can have letter

3    from family and friends saying all they're going

4    to give you is emotional and spiritual support.

5    Those are good.  Any that's going to give you

6    financial support, any that's going to give you

7    housing, and any that will give you

8    transportation.  So the specificity is the key,

9    and again, this will give you the opportunity to

10   do that.  3042 responses.  You were here, you

11   heard the comments from the representative from

12   the Sacramento County District Attorney's Office

13   indicating the opposition to the granting of

14   parole.  The panel also made the following

15   findings, and that is that we're just not ready

16   today to grant a date, and it's that we don't

17   have the confidence that is appropriate.  And

18   what we'd like to have you prepare for the next

19   panel is additional evidence that is documented,

20   that would speak and give the panel some

21   considerations with respect to number one, your

22   insight, and to give the panel some very clear

23   definition as to what kind of a person you are

24   today.  What makes you a different person today,

25   that would be less likely to respond the way that

26   you responded to situations when you were

27   **KENNETH HARRIS   D-62491 DECISION PAGE 5 11/02/06**

62

1    younger.  And the anger issues -- what kind of

2    assurance can you give the panel that you're not

3    a safety threat.  We don't necessarily feel that

4    we have that today.  This is a very important and

5    significant decision that we're being called upon

6    to make, and we don't take that responsibility

7    lightly.  Commissioner Sellwood basically

8    summarized by saying that anything and everything

9    you can do, in writing, even if you just bring it

10   to the panel and present it to us verbally.  But

11   to have that to give the panel everything and

12   anything that you can do to assure us that the

13   things that we've talked with you about jus now

14   are no longer and issue, or how you would

15   respond.  We considered whether this is something

16   you could do in a year, or if you needed

17   additional time.  All of us concluded you're a

18   bright enough guy that I think you can accomplish

19   this is year, which is one of the operating

20   reasons as to why we didn't go for a longer

21   period of denial.  You seem to have put together

22   a pretty good package in the other areas, as

23   evidenced by what we've already read into the

24   record for you.  So what we are going to

25   encourage overview you to do during this next

26   year is first of all, make sure that you do

27   **KENNETH HARRIS  D-62491 DECISION PAGE 6 11/02/06**

63

1    remain disciplinary-free, that whatever self-help
2    you're doing continue doing your self help.
3    Certainly cooperate with the clinician, and then
4    finally take part our comments once you read them
5    in the transcript, and begin to put that package
6    together for the next panel.  The other thing
7    that certainly wouldn't help, that would give you
8    some indication, it would also give you a
9    roadmap, is put together a two to three-year plan
10   when you get out.  What do  you want to do the
11   first year"  What do you want to do there second
12   year?  Don't go more that three years, because
13   you're just -- that becomes  But to realistically
14   put together a plan.  I don know if you've given
15   thought that -- what do you want to do first year
16   you get out?  And having the opportunity to sit
17   down, write it out, come back and revisit it a
18   number of times, and right before you come back
19   before your next panel, revisit it for that one
20   last time, to make sure that you're still ion
21   target of what you truly feel in your heart and
22   your head that you want to do when you finally
23   get out of here.  Commissioners, this was kind of
24   a lengthy proceeding, and I don't know if I've
25   got everything.

26          **COMMISSIONER ENG:**  Again, I can't stress
27   **KENNETH HARRIS  D-62491 DECISION PAGE 7 11/02/06**

64

1    enough that -- to pay attention, a lot of

2    attention to what the commissioner's just told

3    you, and really read and try to understand that

4    transcript and what was said to you.  I think

5    it's very important.  And I think you're on the

6    right track.  Stay focused, and I wish you the

7    best of luck.

8         DEPUTY COMMISSIONER SELLWOOD:  Only to

9    tell you that you were unable today to give me

10   the confidence of who you are, if that's a

11   radically different person from who your were.

12   And you must work to ensure that the next panel

13   has that confidence.  Thank you Commissioner.

14        PRESIDING COMMISSIONER GARNET:    Very

15   good.  Thank you everyone.  It's now 1:40 p.m.,

16   and that concludes this hearing.  Good luck to

17   you sir.

18             A D J O U R N M E N T

19                  --oOo--

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON:____MAR 0 2 2007____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   KENNETH HARRIS  D-62491 DECISION PAGE 8 11/02/06

65

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, ANTONETTE KOONS, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY in SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH HARRIS, CDC No. D-64291, on November 2,2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 17, 2007 at Sacramento County, California.

_Antonette Koons_

_____

Antonette Koons
Transcriber
**Northern California Court Rptrs**

# EXHIBIT "B"

STATE OF CALIFORNIA
CALCULATION WORKSHEET
OBIS CREDIT CODE 32
CDC 1897M (04/00)

DEPARTMENT OF CORRECTIONS

## CALCULATION WORKSHEET FOR INDETERMINATE PC SECTION 2931

This form is used to calculate the Minimum Eligible Parole Date (MEPD) for inmates serving indeterminate (ISL) terms eligible for credit per Penal Code (PC) Section 2931. (Note: Inmates convicted of murder committed on/after June 3, 1998 are ineligible for credit, per PC Section 2933.2.) ISL PC Section 2931 terms are entered into the Offender Based Information System (OBIS) as a Credit Code 32.

| Section A - Original MEPD Calculation | | Section B - Participation Credit (PC) | | | |
|---|---|---|---|---|---|
| 1. Start Date | $7-30-87$ | 1. CDC Conduct Credit (Section A, Line 11) | | | |
| 2. Plus Time Imposed | + _15yrs_ <br> = $7-30-02$ | 2. Divide Line B-1 by 4, equals <br> Participation Credit | | * | |
| 3. Minus Pre/Postsentence Credit | − _429_ <br> = $5-27-01$ | Any fractions over 0.5 are rounded up and fractions under 0.5 are rounded down. When the fraction is exactly 0.5, the PC is rounded down and the BC is rounded up per DOM Section 73030.8.10. | | | |
| 4. Minus Vested Credit <br> (1/2 postsentence credit) | − _13_ <br> = $5-14-01$ | Participation Credit Losses/Restorations | | | |
| 5. Plus Dead Time | + _⊖_ | Date of CDC 115 | Loss | Restored | Net Loss |
| 6. Equals Maximum Eligible <br> Parole Date | = $5-14-01$ | _____ | _____ | _____ | _____ |
| 7. Minus Start Date (Line A-1) | _7-30 87_ | _____ | _____ | _____ | _____ |
| 8. Equals days to serve | = _5037_ | | | | |
| 9. Minus Dead Time | _⊖_ | 3. Net PC Losses (cannot exceed Line B-2): | | | |
| 10. Equals Days Where Credit <br> May Be Applied | = _5037_ | Section C - Behavior Credit (BC) | | | |
| | | 1. Participation Credit (Section B, Line 2) | | | |
| | | 2. Multiply Line C-1 by 3, equals <br> Behavior Credit | | * | |
| 11. Equals CDC Conduct Credit <br> (divide Line A-10 by 3, round up) | = _1679_ | Behavior Credit Losses/Restorations | | | |
| | | Date of CDC 115 | Loss | Restored | Net Loss |
| 12. Maximum Eligible Parole <br> Date (Line A-6) | $5-14 01$ | _9-10-85_ | _150_ | _150_ | _⊖_ |
| 13. Minus CDC Conduct <br> Credit (Line A-11) | _1679_ | _____ | _____ | _____ | |
| 14. Equals Original MEPD | = $10-8-56$ | 3. Net BC Losses (cannot exceed Line C-2): | | | _⊖_ |

### Section D: Calculating Adjusted MEPD

| | |
|---|---|
| Original MEPD (from Section A, Line 14) | $10-8-56$ |
| Plus Net PC and BC Losses (Line B-3 plus Line C-3) | + _⊖_ |
| Equals Adjusted MEPD (cannot exceed Maximum Eligible Parole Date) | = $10-8-56$ |

Maximum Eligible Parole Date (from Section A, Line 6) _____

| CALCULATED BY (Name and Title) <br> E. M. Encayo | | DATE <br> 3-5-06 |
|---|---|---|
| INMATE'S NAME <br> Harris | CDC NUMBER <br> D62451 | LOCATION <br> CM |

*Line B-2 plus Line C-2 must equal Line A-11/B-1.

# EXHIBIT "C"

9.6
SH

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**AUGUST 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**JULY 9, 2004**

This is the eighth psychological evaluation for the Board of Prison Terms on inmate Kenneth Ray Harris, CDC# D-62491. This report is based on a psychodiagnostic interview of the inmate, conducted on 07/09/04 for approximately two hours. His Central file and unit health record was also reviewed. This clinical interview and review of all pertinent documents was for the express purpose of preparing this report.

**PSYCHOSOCIAL ASSESSMENT**

**I.    IDENTIFYING INFORMATION:**

Inmate Harris is a 42-year-old, black male born on 09/09/61. He reported no particular religious preference. He denied having a nickname or AKA. He reported and showed two tattoos. The letter "D" was tattooed on his left chest, and on the back of his left hand was a playboy bunny. He had no other unusual or identifying physical characteristics.

**II.    DEVELOPMENTAL HISTORY:**

Inmate Harris denied a history of birth defects, abnormalities of developmental milestones, or significant childhood illness or injury. He denied a history of arson or cruelty to animals. He denied a history of physical or sexual abuse as either a perpetrator or a victim. The inmate described his development as absolutely normal.

**III.    EDUCATIONAL HISTORY:**

Inmate Harris indicated that he attended kindergarten through the seventh grade in Marina, California. While in the seventh grade, his father (a military person) was transferred to Germany. As a result, the inmate attended the American school on the military base through the seventh, eighth, and ninth grades. As a result of his father's deployment, the inmate still speaks a bit of German.

The inmate indicates that his father was transferred back to the Seaside area, and he entered tenth grade at Seaside High School. He graduated high school in 1979.

In 1980, inmate Harris entered Utah State University on a football scholarship. He attended for approximately one year. He then returned to Marina, and began

COPY TO INMATE ON 1-08-04

HARRIS, KENNETH RAY
CDC NUMBER: D-62491
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

attending Monterey Peninsula College.  The inmate indicates that he hoped to attend San Jose State University on a football scholarship, and was accepted by San Jose State University, and moved to that area.  Due to regulation problems, it was discovered that he could not attend San Jose State University and play football until he had received a degree from a different institution.  As a result, he attended classes at San Jose City College and at Evergreen Valley College in East San Jose, California.  He then transferred those credits to Monterey Peninsula College, where he earned his AA degree in 1984.

The inmate never returned to San Jose State University to play football.  After being incarcerated, the inmate earned a certificate in vocational silk screening at Solano State Prison in 1995.  He earned a certificate in appliance repair here at CTF in 1998.

## IV.    FAMILY HISTORY:

Inmate Harris indicates that he was born into an intact family.  His mother passed away in 1994 at the approximate age of 57 from cancer.  His father, who is approximately 68 years of age, continues to reside in Marina, California.  He is currently receiving military retirement.  The inmate indicated that he had one brother and two sisters.  The inmate indicates that he was born in Hawaii; one sister was born in Mississippi, the other sister was born in Missouri, and his brother was born in Colorado.  His brother passed away in 1995 in a swimming accident.  Both of his sisters currently reside in Marina.  One sister works for the Marina Police Department, and the other works in the community.

Inmate Harris described his family as well within the normal range.  In my opinion, and from the inmate's presentation, the previous psychiatric report done for the Board of Prison Terms appears to have overstated the extent of the family discipline or dysfunction.  The inmate indicated that his father in the past had been alcoholic, but that he stopped drinking approximately 10 years ago.  He indicated that no other members of his family have abused drugs, nor is there any history of mental illness.  The inmate indicated that he is the only member of his family ever to be arrested.

## V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Harris is exclusively heterosexual.  He indicates that his first sexual intercourse occurred when he was 13 years of age.  He indicated that Janice Johnson, a 13-year-old girl he met in Germany while both were attending the base school, was the aggressor in their sexual union.  When asked how he would characterize that encounter, he smiled, saying, "It went good."  The inmate indicates that most of his sexual contacts subsequently were within relationships.  He indicated that he had some casual sexual experiences from time to time, but they were atypical.  He indicated that he used the services of a prostitute only one time, but that even that time he used a condom.

HARRIS, KENNETH RAY
CDC NUMBER: D-62491
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

When questioned about unusual or sexual aggressive behavior, the inmate adamantly denies ever engaging in sexually aggressive behavior. The central file contained a CII report in which it indicates that the inmate was charged for a sex offense; however, it indicates that he was acquitted of these charges, and related charges were dismissed. As a result of this acquittal and dismissal of other charges, this is a non-issue for this clinician.

## VI.  MARITAL HISTORY:

Inmate Harris indicates that he has never been married, and denies having any children.

## VII.  MILITARY HISTORY:

Inmate Harris denied any military history.

## VIII.  EMPLOYMENT/INCOME HISTORY:

As inmate Harris was incarcerated at a relatively young age, his work experience in the community is somewhat limited. As a student, he earned a football scholarship, which became his primary support. After his years as a student, he supported himself working as a roofer or in general construction. He was also employed as a personal trainer at the Family's Fitness center in San Jose, California.

At present, the inmate is employed as a unit porter, earning approximately $20 a month. As the inmate is well educated and articulate, in the past he has worked as a clerk. His most recent clerking position was for the watch commander.

## IX.  SUBSTANCE ABUSE HISTORY:

In reviewing the probation report and previous psychiatric evaluations for the Board of Prison Terms, the inmate's drug abuse and drug of choice varies widely from report to report. I discussed this with the inmate at length, and he indicated that the following account is the most correct.

Inmate Harris indicated that previous reports were in error, and he could not explain it. The inmate indicates that at approximately the age of 8, he began consuming beer at family functions. He indicated that his parents were not aware of this, but that his intoxication would sometimes rise to a level that was noticed by his parents. He began abusing marijuana at the age of 15. He indicates that he started using PCP at the age of 22, but indicates that he only used it approximately ten times.

The inmate indicates that he also abused Benzedrine in an attempt to increase his football prowess. However, he indicated that it was the worst he had ever played,

HARRIS, KENNETH RAY
CDC NUMBER: D-62491
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

and he stopped using Benzedrine. The inmate indicates that although his primary drug of choice is alcohol, at the time of the offense he was under the influence of PCP and alcohol.

When questioned about drug treatment in the community, inmate Harris indicates that on a previous arrest, he was incarcerated in the county jail, and his attorney convinced the judge to place him in a drug diversion program. He indicates that he entered the halfway house in San Jose, California, and continued to attend Alcoholics Anonymous. After the commitment offense, inmate Harris began attending Alcoholics Anonymous and Narcotics Anonymous in the Department of Corrections.

In addition to the above, he attended programs provided to inmates, including "Breaking Barriers" and "Life Skills." The inmate indicates that he has been drug-and-alcohol-free for at least 15 years.

Inmate Harris's only CDC-115, for possession of marijuana, was on 09/10/89, for which he was found guilty, and given 150 days' loss of behavioral credits.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Harris denies a psychiatric history, both in the community and in the Department of Corrections. The record indicates that the only psychiatric contacts in the Department of Corrections are related to Board of Prison Terms' reports. The inmate indicates that he has never suffered from a major medical illness or major injury.

He indicates that he currently suffers from allergies and bone spurs on his back. He is currently being treated for both of these conditions through the medical department, and is receiving appropriate medication. He is receiving no psychiatric services at the institution, and none are indicated.

## XI.    PLANS IF GRANTED RELEASE:

Inmate Harris indicates that as he has lived almost his entire life in the Monterey-Salinas area, his plan is to live either in Salinas with his lifelong friend, Fred Beliunas, or with his father in Marina. The inmate indicates that his friend, Mr. Beliunas, who owns his own construction company, has also offered him a job as a general laborer. The inmate also indicated that his family owns a store in Seaside, and he may also work there. The inmate indicated that he also plans to attend Alcoholics Anonymous in the community. The inmate's plans seem appropriate and reasonable.

HARRIS, KENNETH RAY
CDC NUMBER: D-62491
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

Throughout the psychodiagnostic interview, the inmate was appropriate in mood
and cognition. He was alert and oriented to person, place and time. He was well
dressed and well groomed. His speech was appropriate, and the level of that
speech was appropriate. His mood was stable and appropriate to the situation. He
denied any psychiatric disorder, and nothing in his presentation suggested that he
suffered from a major mental illness. There were no indications of psychotic
thinking, delusional beliefs, or instability of mood. His level of intelligence is at
least in the average range, probably slightly higher.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      V71.09 – No Contributory Clinical Disorder.
AXIS II:     V71.09 – No Contributory Personality Disorder.
AXIS III:    Allergies and bone spurs.
AXIS IV:     Incarceration.
AXIS V:      Current GAF = 85.

Although inmate Harris has had a diagnosis of substance abuse, in institutional
remission, that diagnosis is no longer appropriate as the inmate's substance abuse
is too distant. The inmate has maintained his sobriety when, unfortunately, drugs
are readily available in the institution. This clearly indicates that a statement of
"institutional remission" is inappropriate. Although much was made of a
personality disorder in previous psychiatric reports for the Board of Prison Terms,
nothing in the inmate's presentation throughout our two-hour contact suggested a
personality disorder, nor does his performance in the Department of Corrections
over the last 11 years. As a result, his Axis II diagnosis is "None."

### XIII.   REVIEW OF LIFE CRIME:

Inmate Harris's horrific commitment offense is well documented throughout his
central file and the psychiatric reports completed for the Board of Prison Terms.
As a result, they will not be repeated here.

When questioned about his feelings about his commitment offense, the inmate
stated, "I feel terrible about this. It is a part of my history I can't live down; it is
still there. It is the hardest thing. I have trouble talking about it. It is so distant
from who I am now. I am very remorseful." The inmate went on to discuss this
at great length, and it became clear that the commitment offense was ego-
dystonic; that is, the offense was alien to the kind of person that he is now, which
makes it somewhat difficult to understand and explain. It is clear that alcohol
abuse and drug abuse played a significant role in his commitment offense.

**HARRIS, KENNETH RAY**
**CDC NUMBER: D-62491**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE SIX**

### XIV.   ASSESSMENT OF DANGEROUSNESS:

A.   In reviewing inmate Harris's CDC-115s, there are no violent behavior reports—not even a mutual combat. It clearly indicates that throughout his long incarceration, he has not posed a physical threat to either inmate or staff. Although the inmate's prior arrest and commitment offense are significant, they occurred approximately 18 years ago. At present, and given all of the above, the inmate's violence potential as compared to this level II inmate population is below average.

B.   As a young man, inmate Harris was abusing alcohol and drugs, and experienced some significant arrests prior to his commitment offense. Clearly, the commitment offense is horrific. However, the inmate has remained completely incident-free in the Department of Corrections for the last 11 years, and throughout his 18-year incarceration, he has not been disciplined even one time for aggressive behavior. Combining this with his maturity and increasing age, if this inmate were released to the community, his violence potential would be considered to be no more than the average citizen in the community.

C.   Due to the inmate's substance abuse and alcohol abuse in the distant past, it is very unlikely that he would return to alcohol or drug abuse in the future. However, should that occur in the community, it would be a significant risk as a precursor to violence for this individual.

### XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

1.   Inmate Harris is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has largely done so during his incarceration.

2.   This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period of following on parole.

3.   Although inmate Harris had a drug and alcohol problem in the distant past, it does not currently appear to be an issue, and as a result, no treatment in the community is being recommended. However, I would leave the requiring of random urinalysis testing and drug or alcohol treatment in the community at the discretion of Paroles and Community services.

**S. Sexton, Ph.D.**
**Consulting Psychologist**
**Correctional Training Facility, Soledad**

**HARRIS**        **D-62491**        **CTF-CENTRAL**        **07/09/04**        **gmj**

HARRIS, KENNETH RAY
CDC NUMBER:  D-62491
BPT PSYCHOLOGICAL EVALUATION
PAGE SEVEN


*[signature]*, Ph.D.

**B. Zika, Ph.D.**
**Senior Supervising Psychologist**
**Correctional Training Facility, Soledad**

SS/gmj

D:  07/09/04
T:  07/15/04

D:\Word Files\BPT - 2004\HARRIS, KENNETH  D-62491  07-04  SEXTON.doc

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, ____Kenneth R. Harris_____, declare:

I am over 18 years of age and a party to this action. I am a resident of _____Soledad State_____

_____Prison,

in the county of _____Monterey_____,

State of California. My prison address is: ___P.O. Box 689___Soledad, Ca. 93960-0689

On___January 24th, 2008_____,
(DATE)

I served the attached: __Petition for Writ of Habeas Corpus, United States__

__District Court, Eastern District of California__
(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

Clerk of the Court
United States District Court
Eastern District of California
501 I Street 4-4000
Sacramento, Calif. 95814

Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, Calif. 94102-7001

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on ___1-28-08_____          _____
(DATE)                                    (DECLARANT'S SIGNATURE)

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

**FILED**

Harris, Kenneth R.
    Petitioner

vs.

Curry, Ben (Warden)
    Respondent(s)

**APPLICATION TO PROCEED
IN FORMA PAUPERIS
BY A PRISONER**

**CASE NUMBER:**

FEB 1 1 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                DEPUTY CLERK

2 0 8 - CV - 3 1 4   MCE  JFM  HC

I, _____ KENNETH R. HARRIS _____, declare that I am the petitioner in the above-entitled proceeding; that, in support of my request to proceed without prepayment of fees under 28 U.S.C. § 1915, I declare that I am unable to pay the fees for these proceedings or give security therefor and that I am entitled to the relief sought in the petition.

In support of this application, I answer the following questions under penalty of perjury:

1. Are you currently incarcerated:   ☒ Yes     ☐ No (If "No" DO NOT USE THIS FORM)

   If "Yes" state the place of your incarceration.   CTF—SOLEDAD

   **Have the institution fill out the Certificate portion of this application.**

2. Are you currently employed?   ☒ Yes     ☐ No

   a. If the answer is "Yes" state the amount of your pay. $48.00 monthly, minus 55% restitution

   b. If the answer is "No" state the date of your last employment, the amount of your take-home salary or wages and pay period, and the name and address of your last employer.

3. In the past twelve months have you received any money from any of the following sources?

   a. Business, profession or other self-employment        ☐ Yes     ☒ No

   b. Rent payments, interest or dividends                 ☐ Yes     ☒ No

   c. Pensions, annuities or life insurance payments       ☐ Yes     ☒ No

   d. Disability or workers compensation payments          ☐ Yes     ☒ No

   e. Gifts or inheritances                                ☐ Yes     ☒ No

   f. Any other sources                                    ☐ Yes     ☒ No

If the answer to any of the above is "Yes" describe by that item each source of money and state the amount received **and** what you expect you will continue to receive. Please attach an additional sheet if necessary.

ifpform.hab (rev. 7/02)

4. Do you have cash or checking or savings accounts?

If "Yes" state the total amount: _____

5. Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or other valuable property?                          ☐ Yes        ☒ No

If "Yes" describe the property and state its value. _____

6. Do you have any other assets?                          ☐ Yes        ☒ No

If "Yes" list the asset(s) and state the value of each asset listed.

7. List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.      N / A

I declare under penalty of perjury that the above information is true and correct.

__1-28-08__
DATE

_____
SIGNATURE OF APPLICANT

## CERTIFICATE
(To be completed by the institution of incarceration)

I certify that the applicant named herein has the sum of $ _45.90_ on account to his/her credit at

_CORRECTIONAL TRAINING FACILITY_ (name of institution). I further certify that during the past six months

the applicant's average monthly balance was $ _40.78_ . I further certify that during the past six months the

average of monthly deposits to the applicant's account was $ _18.00_ .

__2-2-08__
DATE

_Brenda Nation, Acct Technician_
SIGNATURE OF AUTHORIZED OFFICER

ifpform.hab (rev. 7/02)

CORRECTIONAL TRAINING FACILITY
P.O. BOX 686
SOLEDAD, CA  93960
ATTN:  TRUST OFFICE



THE WITHIN INSTRUMENT IS A CORRECT
COPY OF THE TRUST ACCOUNT MAINTAINED
BY THIS OFFICE.
ATTEST: _2-2-08_
CALIFORNIA DEPARTMENT OF CORRECTIONS
BY _Brenda Nation_
TRUST OFFICE
_Acct Technician_

```
REPORT ID: TS3030  .701                        REPORT DATE: 02/02/08
                                               PAGE NO:        1

                    CALIFORNIA DEPARTMENT OF CORRECTIONS
                       CTF SOLEDAD/TRUST ACCOUNTING
                       INMATE TRUST ACCOUNTING SYSTEM
                       INMATE TRUST ACCOUNT STATEMENT


              FOR THE PERIOD: SEP. 03, 2007 THRU FEB. 02, 2008


ACCOUNT NUMBER : D62491          BED/CELL NUMBER: CFZWT1000000109L
ACCOUNT NAME   : HARRIS, KENNETH RAY        ACCOUNT TYPE: I
PRIVILEGE GROUP: A
                         TRUST ACCOUNT ACTIVITY
```

```
      TRAN
DATE  CODE DESCRIPTION   COMMENT   CHECK NUM DEPOSITS  WITHDRAWALS  BALANCE
----- ---- ------------- --------- --------- --------- ----------- ----------


09/03/2007  BEGINNING BALANCE                                       21.90

09/07*VD54 INMATE PAYROL 0786 P19              21.60                43.50
09/08 W502 POSTAGE CHARG 0806 POST                         4.60     38.90
09/08 W502 POSTAGE CHARG 0806 POST                         4.60     34.30
09/21 W512 LEGAL POSTAGE 0976 LPOST                        2.33     31.97
09/21 W512 LEGAL POSTAGE 0976 LPOST                        2.33     29.64
10/06*VD54 INMATE PAYROL 1113 P20             21.60                 51.24
10/23 FC01 DRAW-FAC 1    1302 ML                          20.00     31.24
11/03*VD54 INMATE PAYROL 1417 P14             21.60                 52.84
11/26 FC01 DRAW-FAC 1    1668 MAIN                        30.94     21.90
12/05*VD54 INMATE PAYROL 1741 P17             21.60                 43.50
12/26 FC01 DRAW-FAC 1    1970 ML                          21.60     21.90
   ACTIVITY FOR 2008
01/03*VD54 INMATE PAYROL 2036 P10             21.60                 43.50
01/22 FR01 CANTEEN RETUR 702292                           2.40-     45.90
```

```
                         CURRENT HOLDS IN EFFECT

   DATE      HOLD
  PLACED     CODE        DESCRIPTION          COMMENT    HOLD AMOUNT
---------    ----  ----------------------------  ----------  -----------

07/09/2007   H200  GENERAL HOLD                0101/3688      21.60
07/20/2007   H107  POSTAGE HOLD                0256 POST       0.30
```

```
                    * RESTITUTION ACCOUNT ACTIVITY

DATE SENTENCED: 07/02/87                   CASE NUMBER: 79658
COUNTY CODE: SAC                           FINE AMOUNT: $  3,000.00


  DATE      TRANS.   DESCRIPTION            TRANS. AMT.    BALANCE
--------    ------   ---------------------------  -----------  -----------

09/03/2007  BEGINNING BALANCE                                 2,297.64
```

CORRECTIONAL TRAINING FACILITY
P.O. BOX 686
SOLEDAD, CA  93960
ATTN:  TRUST OFFICE



THE WITHIN INSTRUMENT IS A CORRECT
COPY OF THE TRUST ACCOUNT MAINTAINED
BY THIS OFFICE.
ATTEST: 2-2-08
CALIFORNIA DEPARTMENT OF CORRECTIONS
BY _Brenda Nation_
   TRUST OFFICE
   Acct Technician

REPORT ID: TS3030 .701                          REPORT DATE: 02/02/08
                                                PAGE NO:      2

                        CTF SOLEDAD/TRUST ACCOUNTING
                        INMATE TRUST ACCOUNT STATEMENT


                FOR THE PERIOD: SEP. 03, 2007 THRU FEB. 02, 2008


ACCT:  D62491      ACCT NAME: HARRIS, KENNETH RAY        ACCT TYPE: I



                     * RESTITUTION ACCOUNT ACTIVITY


DATE SENTENCED: 07/02/87                 CASE NUMBER: 79658
COUNTY CODE: SAC                         FINE AMOUNT: $   3,000.00

  DATE      TRANS.   DESCRIPTION              TRANS. AMT.    BALANCE
--------    ------   ------------------------------   -----------   -----------
09/07/07    VR54     RESTITUTION DEDUCTION-SUPPORT      24.00-     2,273.64
10/06/07    VR54     RESTITUTION DEDUCTION-SUPPORT      24.00-     2,249.64
11/03/07    VR54     RESTITUTION DEDUCTION-SUPPORT      24.00-     2,225.64
12/05/07    VR54     RESTITUTION DEDUCTION-SUPPORT      24.00-     2,201.64
01/03/08    VR54     RESTITUTION DEDUCTION-SUPPORT      24.00-     2,177.64


     * THIS STATEMENT DOES NOT REFLECT THE ADMINISTRATIVE FEE CHARGE THAT *
     * IS EQUAL TO TEN PERCENT OF THE RESTITUTION AMOUNT COLLECTED.       *


                         TRUST ACCOUNT SUMMARY


 BEGINNING      TOTAL       TOTAL        CURRENT      HOLDS     TRANSACTIONS
  BALANCE     DEPOSITS   WITHDRAWALS     BALANCE     BALANCE    TO BE POSTED
------------- ------------- ------------- -------------- ----------- --------------
    21.90      108.00       84.00         45.90        21.90         0.00
------------- ------------- ------------- -------------- ----------- --------------
------------- ------------- ------------- -------------- ----------- --------------


                                            CURRENT
                                            AVAILABLE
                                            BALANCE
                                          --------------
                                               24.00
                                          --------------
                                          --------------


CORRECTIONAL TRAINING FACILITY
P.O. BOX 686
SOLEDAD, CA  93960
ATTN:  TRUST OFFICE

THE WITHIN INSTRUMENT IS A CORRECT
COPY OF THE TRUST ACCOUNT MAINTAINED
BY THIS OFFICE.
ATTEST: 2-2-08
CALIFORNIA DEPARTMENT OF CORRECTIONS
BY _____
    TRUST OFFICE
       Acct Technician

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

Office of the Clerk

| | | |
|---|---|---|
| **Victoria C. Minor** | 501 "I" Street | Divisional Office |
| Clerk of Court | Sacramento, CA 95814 | 2500 Tulare Street |
| | | Fresno, CA 93721 |

**February 12, 2008**

**Case Number:    2:08–CV–00314–MCE–JFM**

**Case Title:    KENNETH RAY HARRIS,           vs.   BEN CURRY,**

Dear Litigant,

You are hereby notified that the above case number has been assigned to your action. You are to include the complete case number on all documents sent to the court for filing in this case. Failure to do so results in delayed processing of your documents.

All matters in this action shall be sent to the following address until further notice:

Office of the Clerk
United States District Court
Eastern District of California
501 "I" Street , Suite 4–200
Sacramento, CA 95814

For timely processing of your pleadings or correspondence, please comply with our Local Rules of Court, in particular:

**Local Rule 5–133**  The court requires an original plus one copy of each document sent for filing. If you desire to receive a conformed copy for your records, you must send an original and two copies of your document and a pre–addressed postage–paid envelope for us to return your copy to you.

**Local Rule 5–135**  Once the defendant(s) have served a responsive pleading, you are under an ongoing duty to serve them with copies of all documents you submit to the court. A proof of service shall be attached to the original of any document lodged or filed with the court, showing the date, manner and place of service. A sample proof of service is attached.

**Local Rule 7–130**  Documents submitted to the court must be legible, on 8–½ " x 11" paper, with writing on one (1) side of the page only. Each separate document must be stapled at the top left corner and pre–punched with two (2) holes centered 2–¾" apart, ½" from the top edge of the page. Each page should be numbered consecutively at the bottom.

**Local Rule 7–132**  Every document submitted to the court must include your name, address and prisoner identification number in the upper left hand corner of the first page. The caption on the first page must include the title of this court, the title of the action, the case number assigned to this action (including all initials and letters that follow the number), and the title of your document. If you are pursuing more than one action in this court, you must submit a separate original document and the appropriate number of copies for each action in which you want the document filed.

**Local Rule 6–142**  A request for extension of time must state the reason an extension is needed. A request for extension of time should be filed before the deadline in question.

**Local Rules 30–250, 33–250, 34–250 and 36–250**  Discovery requests or responses should not be submitted to the court unless they are relevant and necessary to support or oppose a motion at issue before the court.

**Local Rule 83–182**  Each party appearing in propria persona is under a continuing duty to notify the Clerk and all other parties of any change of address.

**Other Provisions:**

**Request for Case Status**  The court will notify you as soon as any action is taken in your case. Due to the large number of civil actions pending before the court, THE CLERK IS UNABLE TO RESPOND IN WRITING TO INDIVIDUAL INQUIRES REGARDING THE STATUS OF YOUR CASE. As long as you keep the court apprised of your current address, you will receive all court decisions which might affect the status of your case.

**Copy Work**  The Clerk's Office does not provide copies of documents to parties. Copies of documents may be obtained from Attorney's Diversified Service (ADS) by writing to them at: 1424 21st Street, Sacramento, CA 95814, or by phoning 916–441–4396 or 916–441–4466. The court will provide copies of docket sheets at $0.50 per page. **Note: In Forma Pauperis** status does not include the cost of copies.

Victoria C. Minor
Clerk of Court
United States District Court

by:  /s/  D. Duong
Deputy Clerk

The following is a sample Proof of Service.   Pursuant to Rule 5 of the F.R.Cv.P. and Local Rule 5–135, each document filed after the court orders service in your case shall be served on opposing counsel and a proof of service attached to your document filed with the court.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

(Case Title) _____

                    Plaintiff or Petitioner

V.                                                    Case Number: 2:99–CV–99999 ABC DFG
                                                      (example case no.)

_____

                    Defendant or Respondent          **SAMPLE PROOF OF SERVICE**

_____     /

    I hereby certify that on     (Date)_____, I served a copy

of the attached     (Title of Document Served and Filed)_____,

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said

enevelope in the United States Mail at     (Location of Mailing)_____:

**(List Name and Address of Each Defendant or Attorney Served)**

I declare under penalty of perjury that the foregoing is true and correct.

                                        _____

                                        (Name of Person Completing Service)

**NOTICE OF AVAILABILITY OF A MAGISTRATE JUDGE**

**TO EXERCISE JURISDICTION AND APPEAL INSTRUCTIONS**

You are hereby notified in accordance with 28 U.S.C §636(c), F.R.Civ.P.73 and Local Rule 73–305, the United States Magistrate Judges sitting in Sacramento and Fresno are available to exercise the court's case dispositive jurisdiction and to conduct any or all case despositive proceedings in this action, including motions to dismiss, motions for summary judgment, a jury or nonjury trial, and entry of a final judgment.  Exercise of this jurisdiction by a Magistrate Judge is however, permitted only if all parties voluntarily consent.  You may, without adverse substantive consequences, withhold your consent, but this will prevent the court's case dispositive jurisdiction from being exercised by a Magistrate Judge.

Any appeal from a judgment entered by a Magistrate Judge is taken directly to the United States Court of Appeals for the Ninth Circuit or, where appropriate, for the Federal Circuit in the same manner as an appeal from any other judgment of a District Court.

Whether or not the parties consent to pursuant to 28 U.S.C. § 636(c) the assigned Magistrate Judge will hear all motions except those case dispositive motions set forth in 28 U.S.C. § 636(b)(1)(A).

A copy of the Form for "Consent to / Decline of Jurisdiction of United States Magistrate Judge" is attached hereto for pro per use and attorney information.  This form is available in fillable .pdf format on the court's web site at www.caed.uscourts.gov for all attorney ECF filers. This form may be filed through CM/ECF or by pro se litigants at the appropriate Clerk's Office location.

| | |
|---|---|
| Office of the Clerk | Office of the Clerk |
| 501 I Street, Room 4–200 | 2500 Tulare Street , Suite 1501 |
| Sacramento, CA 95814 | Fresno, CA 93721 |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

**KENNETH RAY HARRIS,**
Plaintiff(s)/Petitioner(s),

vs.

CASE NO. **2:08–CV–00314–MCE–JFM**

**BEN CURRY,**
Defendant(s)/Respondents(s).

---

**IMPORTANT**
   **IF YOU CHOOSE TO CONSENT OR DECLINE TO CONSENT TO JURISDICTION OF A UNITED STATES MAGISTRATE JUDGE, CHECK AND SIGN THE APPROPRIATE SECTION OF THIS FORM AND RETURN IT TO THE CLERK'S OFFICE.**

---

☐    **CONSENT** TO JURISDICTION OF
**UNITED STATES MAGISTRATE JUDGE**

   In accordance with the provisions of Title 28, U.S.C Sec. 636(c)(1), the undersigned hereby voluntarily consents to have a United States Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment, with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed.

   Date: _____          Signature: _____

Print Name: _____
   ( ) Plaintiff/Petitioner ( ) Defendant/Respondent
( ) Counsel for *_____

---

☐    **DECLINE** OF JURISDICTION OF
**UNITED STATES MAGISTRATE JUDGE**

   Pursuant to Title 28, U.S.C. Sec 636(c)(2), the undersigned acknowledges the availability of a United States Magistrate Judge but hereby declines to consent.

   Date: _____          Signature: _____

Print Name: _____
   ( ) Plaintiff/Petitioner ( ) Defendant/Respondent
( ) Counsel for *_____

---

*If representing more than one party, counsel must indicate name of each party responding.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

# FILED



FEB 25 2008

**KENNETH RAY HARRIS,**

Plaintiff(s)/Petitioner(s),

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

vs.

CASE NO. **2:08–CV–00314–MCE–JFM**

**BEN CURRY,**

Defendant(s)/Respondents(s).

---

**IMPORTANT**
**IF YOU CHOOSE TO CONSENT OR DECLINE TO CONSENT TO JURISDICTION OF A UNITED STATES MAGISTRATE JUDGE, CHECK AND SIGN THE APPROPRIATE SECTION OF THIS FORM AND RETURN IT TO THE CLERK'S OFFICE.**

---

  **CONSENT** TO JURISDICTION OF
**UNITED STATES MAGISTRATE JUDGE**

In accordance with the provisions of Title 28, U.S.C Sec. 636(c)(1), the undersigned hereby voluntarily consents to have a United States Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment, with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed.

Date: 2-20-08        Signature: _Kenney Harris_

Print Name: Kenneth Ray Harris
(X) Plaintiff/Petitioner ( ) Defendant/Respondent
( ) Counsel for * _____

---

☐  **DECLINE** OF JURISDICTION OF
**UNITED STATES MAGISTRATE JUDGE**

Pursuant to Title 28, U.S.C. Sec 636(c)(2), the undersigned acknowledges the availability of a United States Magistrate Judge but hereby declines to consent.

Date: _____        Signature: _____

Print Name: _____
( ) Plaintiff/Petitioner ( ) Defendant/Respondent
( ) Counsel for * _____

---

*\*If representing more than one party, counsel must indicate name of each party responding.*

**UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF CALIFORNIA**

**OFFICE OF THE CLERK
501 "I" Street
Sacramento, CA 95814**

USDC
Northern District of CA
280 S. First St,. Room 2112
San Jose, CA 95113

**RE:        KENNETH RAY HARRIS vs.  BEN CURRY**
**USDC No.:    2:08–CV–00314–MCE–JFM**

Dear Clerk,

Pursuant to the order transferring the above captioned case to your court, dated
March 14, 2008 , transmitted herewith are the following documents.

**Electronic Documents: 1 to 6.**

　Documents maintained electronically by the district court are accessible through
　PACER for the Eastern District of California at **https://ecf.caed.uscourts.gov**.

Please <u>acknowledge</u> receipt on the extra copy of this letter and return to the Clerk's Office.

　　　　　　　　　Very truly yours,

**March 14, 2008**　　　 /s/ **A. Benson**
　　　　　　　　　　_____
　　　　　　　　　Deputy Clerk

RECEIVED BY:　_____
　　　　　　　　　Please Print Name

DATE RECEIVED:　_____

NEW CASE
NUMBER:　　　_____